**07-5390-cv**
**Diana Bell v. Pfizer, Inc. Stock**
**and Incentive Plan et al.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: March 10, 2009        Decided: August 30, 2010)

Docket No. 07-5390-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DIANA BELL,

Plaintiff-Appellant,

v.

PFIZER, INC., PFIZER, INC. STOCK AND INCENTIVE PLAN, PFIZER
EMPLOYEE COMPENSATION AND MANAGEMENT DEVELOPMENT COMMITTEE,
PFIZER, INC. RETIREMENT ANNUITY PLAN, PFIZER, INC. RETIREMENT
COMMITTEE,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER and SACK, Circuit Judges, and COGAN,
District Judge.*

_____
     *The Hon. Brian M. Cogan of the United States District
Court for the Eastern District of New York, sitting by
designation.

1

Appeal from a verdict in a bench trial in the United States District Court for the Southern District of New York (Samuel Conti, Judge), finding that appellees had not breached any fiduciary duties owed to appellant under ERISA. We affirm on the ground that any misstatement did not relate to an ERISA plan.

Judge Cogan dissents in a separate opinion.

ROBERT D. KRAUS (Geoffrey A. Mort, on the brief) Kraus & Zuchlewski LLP, New York, New York, for Plaintiff-Appellant.

ROBERT P. LEWIS (Peter J. Engstrom, Nancy Chung Allred, Vasilia F.L. Pappas, on the brief), Baker & McKenzie LLP, New York, New York, for Defendants-Appellees.

WINTER, Circuit Judge:

Diana Bell, M.D., appeals from Judge Conti's bench trial verdict that appellees had not breached any fiduciary duties owed to her under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

On May 31, 2003, Bell terminated her employment with Pfizer, Inc. Before leaving Pfizer, Bell made various inquiries of Pfizer Human Resources ("HR") personnel and Benefits administrators regarding her eligibility for, and the

terms of, retirement[1] under the Pfizer Retirement Annuity Plan (the "PRAP" or the "Plan"), including the treatment of her stock options if she left Pfizer's employ.  She alleges that she received various writings and oral advice assuring her that her stock options would remain exercisable for the remainder of the grant period if she left Pfizer.  However, on or about August 15, 2003, Bell was informed by Pfizer that certain of her stock options had been cancelled and that others would be cancelled on September 1, 2003.

Bell commenced the instant action in December 2003.  After a bench trial, the district court held that any misrepresentation concerned only appellant's stock benefits under a non-ERISA plan and, therefore, did not violate any fiduciary obligations under ERISA.  Bell appeals.

We affirm on the ground that the only misinformation conveyed did not relate to appellant's status under the ERISA plan.

BACKGROUND

a)  Pfizer's Retirement Annuity and Stock Incentive Plans

At all relevant times, employees at Pfizer were eligible for various retirement benefits under the Pfizer Retirement

---

[1]In this opinion, we use the terms "retire" and "retirement" to refer only to an employee leaving Pfizer's employment under Sections 4a, b, or d of Pfizer's ERISA plan.  The parties and main participants in the case used the term colloquially to refer to employees who leave and cease work.  Moreover, Pfizer's stock option plan also uses the broader meaning.

Annuity Plan, an employee retirement plan governed by ERISA and administered by Pfizer through the Pfizer, Inc. Retirement Committee.  The PRAP provides for three categories of retirement:  (i) normal retirement under Section 4a, in which PRAP retirement benefits are available to members when they reach age 65; (ii) late retirement under Section 4b, in which PRAP retirement benefits are available to members who remain in service after age 65; and (iii) early retirement under Section 4d, in which PRAP retirement benefits are available to qualifying members who have reached age 55.

The PRAP specifically defines "retire" or "retirement" for purposes of the Plan as "to terminate or the termination of service . . . after meeting the requirements of Sections 4a, b, or d. . . ."  It is undisputed that Bell did not qualify for retirement under Sections 4a, b or d of the PRAP.

The PRAP also provides benefits for a narrow class of employees who wish to cease working but are not eligible to retire under Sections 4a, b or d.  These benefits are paid pursuant to Section 4k of the PRAP, which is entitled "Special Rules for Certain Members Who Are Not Eligible to Retire Under Sections 4a or 4d" and is known by Pfizer employees as the "Pre-1994 benefit."  Section 4k provides an annuity benefit upon "termination" to employees who have completed at least five years of "creditable service" prior to January 1, 1994 and meet certain other conditions.  As elaborated infra, Bell

4

understood at all relevant times that she was eligible for, but only for, the Pre-1994 benefit.

In addition to the PRAP, Pfizer also offers its employees a Stock and Incentive Plan ("SIP"), a non-ERISA plan managed by appellee Pfizer Employee Compensation and Management Development Committee. Pursuant to Section 6(f) of the SIP, an employee's stock options terminate when the employee ceases to be an employee "for any reason including retirement," unless (in pertinent part) the "optionee has retired or is eligible for retirement under Sections 4a., b., or d. of the [PRAP]." The SIP thus uses the term "retirement" more broadly than the PRAP. See supra Note 1. If the employee retires, or is eligible to retire, under Sections 4a, b, or d of the PRAP, the employee's stock options remain exercisable for the remainder of the ten-year life of the option grant, except for options that had been granted within one year of retirement. Leaving under Section 4k, therefore, falls within the terminate "for any reason" clause of 6(f) of the SIP and causes the employee's stock options to terminate.

While employed at Pfizer, Bell participated in the SIP, and on various occasions received and exercised Pfizer stock options. Although Bell never read the SIP in its entirety prior to commencing her lawsuit, she, along with her lawyer

5

husband Wesley Light,[2] had read various documents entitled "Points of Interest" that accompanied each of her stock option grant letters. The "Points of Interest" describe, in layman's terms, the salient features of the SIP, including the treatment of stock options upon the employee's retirement or other termination of employment with Pfizer.

For example, the Points of Interest that were mailed with Bell's 1993 stock option grant specifically addressed the question, "What happens if I retire under the Company's retirement plan?" as follows:

> If you retire from the Company on or before August 25, 1994, your options will terminate on the date of your retirement. Thereafter, if you retire under Section 4, parts a. (normal retirement), b. (late retirement), or d. (early retirement) of the [PRAP] . . . you will have the remainder of the option term to exercise the options that were exercisable on the date of your retirement. . . .

In addition, the 2003 Points of Interest that was mailed with Bell's 2003 stock option grant stated:

> For any and all purposes with respect to this 2003 key employee stock option grant, retirement is defined as having attained a minimum age of 55 and ten years of service at the time of your separation from the company.

---

[2]While it is not a dispositive fact, we note that throughout her planning for leaving Pfizer, Bell was assisted by her lawyer husband who prepared detailed financial analyses of the consequences of her proposed leaving of Pfizer's employ.

b)  Bell's 2001 Retirement Plans

In 2001, when Bell was 49 years old, she received a booklet from Pfizer regarding retirement, which explained the "Pre-1994 benefit," i.e., Section 4k.  Bell also received a pamphlet that Pfizer distributed to its "legacy employees" -- those who had always been directly employed by Pfizer -- which stated that "[if] you're a legacy Pfizer [] Colleague age 50 or older, [Pfizer's] retirement counselor can answer all your retirement questions."  According to this pamphlet, "[t]he retirement counselor is now your primary source for information about eligibility and participation [and] provisions of the [PRAP]," and will provide, inter alia, "one-on-one counseling; a comprehensive, personalized summary of impact of retirement on benefits; [and] a summary of outstanding stock options."  Id.

After reading these materials, Bell concluded that she could leave Pfizer under the Pre-1994 benefit provision; however, she desired clarification as to the extent of her benefits under this provision, including the treatment of her stock options.  Bell then contacted Leighton Gleicher in Pfizer's HR department, who referred Bell to Payal Sahni, a Pfizer HR Specialist.  In February or March 2001, Bell and Sahni met in person, and later continued their dialog via email.

Sahni ultimately referred Bell's benefits questions to Kimberly Malik in Pfizer's pension benefits administration department.  Sanhi forwarded to Malik an email from Bell with the

7

subject line, "Info on Pre-'94 benefits w/ retirement at age 50." Malik originally responded to Bell's inquiries with a preliminary pension estimate "based on a projected retirement date of February 1, 2007" (after Bell's 55th birthday). The pension estimate referred to Bell as a "retiree" and her employment termination as "retirement."

On receipt of her pension estimate, Bell noticed that it assumed a termination date of February 1, 2007, whereas the information she sought from Sahni was what her pension benefits would be if she left in 2002, at age 50. Bell explained this to Sahni, who then requested an additional preliminary estimate from Malik that assumed Bell terminated employment at age 50.

With respect to Bell's stock option questions, Sahni directed Bell to Jacqueline Gomez, a stock options analyst at Pfizer. In May 2001, Bell contacted Gomez by phone to discuss her stock options; the two continued their discussion via email. In an email dated May 10, 2001, Bell asked Gomez to confirm the following:

> As I understand it, if I retire under the [PRAP], I would retain all of my options (even those that were not vested) provided I remain employed at Pfizer for at least one year after the grant date. I would be able to exercise these options at any time during the "life" of the option. . . .
>
> Would you please confirm that my understanding is correct and if this information can be found in some publication, can you direct me to it?
>
> In her reply email to Bell, Gomez stated:

Yes, those are the general guidelines for retirement under the [PRAP]. That information is documented in the Points of Interest which is sent to you along with the grant letter you receive when stock options are granted to you.

In June 2001, Malik sent Sahni a memorandum describing Bell's estimated benefits "based upon a projected termination date of April 1, 2002." Malik's memorandum stated that "[a]s a vested annuitant," Bell would be eligible to receive early payment of her accrued benefit upon "obtaining age 50, or anytime thereafter." Unlike the March 27 memorandum, Malik's June memorandum did not refer to Bell as a "retiree" or to her employment termination as "retirement."

In April 2002, Bell sent a letter to her supervisor, Gary Jortner, designating July 19, 2002 as her final day of employment.

On July 15, 2002, four days before Bell's scheduled final day at Pfizer, the company announced plans to acquire Pharmacia-Upjohn. The proposed merger had two effects on Bell's retirement plans: first, Pfizer's stock fell nearly 20 percent on news of the acquisition, which left many of Bell's stock options underwater; second, Bell viewed the acquisition and reorganization of certain departments as providing her new opportunities to advance in her career within Pfizer. Thus, Bell decided not to retire, and so informed the relevant HR staff members.

c) Bell's 2003 Termination Plans

When the Pharmacia-Upjohn acquisition did not enhance Bell's advancement prospects, she again decided to leave Pfizer in Spring 2003. On April 24, 2003, Bell sent Jortner a second resignation letter, stating "This letter is notice that I will be taking retirement under the [PRAP] for pre-1993 employees, effective June 1, 2003." In her original draft of this letter, Bell wrote "I will be taking an early retirement, effective June 1, 2003." However, her husband recommended, and Bell agreed, that she change the words "taking an early retirement" and replace it with "retiring under the Company's Retirement Annuity Plan." Although Bell accepted this advice, which rendered an accurate statement ambiguous, she knew at the time that she was not eligible for retirement within the meaning of Sections 4a, b, or d of the PRAP.

After mailing her letter to Jortner, Bell called Pfizer's then-new Retirement Hotline and spoke with retirement counselor Peggy McGee. Thereafter, McGee sent Bell a Pfizer Retirement Kit, which referred to Bell as "an employee who is eligible to retire under the [PRAP]."

McGee also contacted Gomez in the SIP office and asked her to prepare a stock option summary for Bell. Gomez then prepared the summary on the assumption that Bell was retiring under Sections 4a, b, or d of the PRAP. This error occurred because Gomez assumed that she would not have been asked by McGee to prepare a summary for someone who was not retiring under the

10

PRAP, i.e., under Sections 4a, b, or d.

After receiving and reviewing the Retirement Kit, Bell wrote an email to McGee that stated in relevant part:

> Many of the documents I have state that retirement is defined by the "rule of 90" or by age $\geq$ 55 + 15 years of credible service. However, we know that under the older, but still honored rule, there is the option to retire at age $\geq$ 50 w/ receipt of pre-93 pension. I hope I'm correct that this applies to retention of previously granted stock options. Can you please confirm this as this is key to my decision to retire.

McGee never responded to Bell's inquiry. However, after sending the email quoted above, Bell received the Stock Option Summary Sheet prepared by Gomez, which designated Bell as "retirement eligible" and listed the majority of her options as exercisable for life. At trial, Bell testified that she interpreted the letter as an answer to her question to McGee regarding her options. However, the letter had actually been sent a day prior to Bell's email to McGee.

Bell left Pfizer on May 31, 2003. Since that date, Bell has been regularly receiving the pre-1994 pension benefit under Section 4k of the PRAP. However, in August 2003, Bell received a Pfizer SIP status report, which stated that some of her stock options had expired, and the balance would expire in several weeks. Bell inquired about the report and was told that she had been incorrectly treated as a retiree with respect to her stock options when she left Pfizer. On August 22, 2003, the manager of the SIP Administration office sent Bell a letter stating:

11

[A]t the time of your termination from Pfizer on May 31, 2003, you did not meet the retirement eligibility criteria under the [PRAP] . . . .

With regard to your stock options, while you did receive a statement indicating the treatment of stock options at Pfizer if you were retirement eligible, further investigation provided that you did not separate as a retirement but as a termination. . . . As we discussed you had outstanding 1995 and 1996 options that lapsed on May 31, 2003. . . . Your grants made in 1997 and later will lapse on September 1, 2003 and will no longer be available for exercise after that date.

Bell exercised the remainder of her stock options on or around August 28, 2003.

e) Underline District Court Proceedings

Bell filed the present action asserting a host of state and federal claims for, inter alia, promissory estoppel, conversion, breach of contract, negligent misrepresentation, and a breach of fiduciary duty under ERISA. Her complaint sought, inter alia, a declaratory judgment that she was retirement eligible when she ended her employment with Pfizer, reinstatement of her employment at Pfizer, reinstatement of her stock options or issuance of comparable options, or monetary damages estimated to exceed $3 million.

Before appellees moved for summary judgment, appellant withdrew all claims based on state law, leaving only her ERISA claims. Judge Wood denied appellees' motion as to the ERISA breach of fiduciary duty claim. Judge Wood concluded that "Pfizer acted in a fiduciary capacity in making statements to

12

[Bell] about her eligibility or ineligibility for early retirement under the PRAP, and in answering [Bell's] questions on the same subject." Bell v. Pfizer, 499 F.2d 404, 410 (S.D.N.Y. 2007). Judge Wood further concluded that genuine issues of material fact existed as to whether Pfizer made material misrepresentations or omissions and whether Bell relied upon these misrepresentations or omissions to her detriment.

The case was then reassigned to visiting Judge Conti, who held a bench trial on the remaining claim in October 2007. Prior to the parties' summations, Judge Conti expressed concern with Judge Wood's summary judgment ruling. He thought that Judge Wood had possibly conflated the SIP and PRAP in finding that Pfizer employees acted in a fiduciary capacity when they advised Bell about her retirement eligibility and treatment of her stock options.

On November 8, 2007, the district court concluded that Pfizer had not breached its ERISA fiduciary duties because "[t]he 'misrepresentations' at the center of this dispute are not about whether or not Dr. Bell was eligible for PRAP benefits. There was no point at which a Pfizer employee led Bell to believe that she was eligible for early, normal, or late retirement under sections 4d, 4a, or 4b of the PRAP. Dr. Bell does not allege the contrary. . . . Rather, the misrepresentations relate to the SIP," which is not an ERISA plan and thus does not give rise to any fiduciary duties. Bell v. Pfizer, No. 03-CV-9945 2007 WL

13

3355386 at *9 (S.D.N.Y. Nov. 8, 2007). The court also concluded that even if Bell had somehow persuaded it that the fiduciary duty from the PRAP extended to the SIP, she had still failed to prove that the alleged misrepresentations were made in the course of the fiduciary relationship because the statements were largely made in the performance of ministerial functions, including the "application of rules determining eligibility for participation or benefits, calculation of services and compensation credits for benefits and calculation of benefits." Id. at 11.

This appeal followed.

DISCUSSION

As noted, appellant withdrew the various state law claims against Pfizer. We also note appellant's argument that the district court decision violated the law of the case doctrine because Judge Conti did not follow Judge Wood's earlier decision. However, Judge Wood's decision does not bind us as to any issue, and we are free, indeed obligated, to apply our own views as to governing law. Steinborn v. Daiwa Sec. Am., Inc., 104 F.3d 351, 351 (2d Cir. 1996).

a) ERISA's Fiduciary Duty

Section 404 of ERISA imposes fiduciary duties on administrators of ERISA retirement plans that, in pertinent part, require a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of: (i) providing benefits to

14

participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). The statute also mandates that fiduciaries discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ." Id.

Section 502 of ERISA sets forth a civil enforcement scheme, defining the types of civil actions that can be brought and the parties entitled to seek relief under the Act. See 29 U.S.C. § 1132. In particular, Section 502(a)(3) authorizes a civil action:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan.

Id. § 1132(a)(3).

Section 502(a)(3) has been held to allow plan beneficiaries to bring individual actions arising from an employer's fiduciary breach, see Varity Corp. v. Howe, 516 U.S. 489, 507-15 (1996), but is restricted in the kinds of relief available. See Great-West Life Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209-20 (2002) (strictly limiting relief under Section 502(a)(3) to equitable relief); Mertens v. Hewitt Assoc., 508 U.S. 248, 256 (1993) (limiting relief under Section 502(a)(3) to "those

15

categories of relief that [are] typically available in equity. . . .").

The threshold question in "every case charging breach of ERISA fiduciary duty" is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Pegram v. Herdrich, 530 U.S. 211, 226 (2000).

The statute generally provides that "a 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." Varity, 516 U.S. at 498 (quoting 29 U.S.C. § 1002(21)(A)). "Under this definition, a person . . . has [fiduciary] status only 'to the extent' that he has or exercises the described authority or responsibility." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 87 (2d Cir. 2001) (alterations in original) (quoting F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1259 (2d Cir. 1987)).

In addition, although Congress intended the term "fiduciary" to be broadly construed, Frommert v. Conkright, 433 F.3d 254, 271 (2d Cir. 2006), "even [this] broad construction has limits."

16

*Chapman v. Klemick*, 3 F.3d 1508, 1512 (11th Cir. 1993). Falling outside these limits are plan employees who perform ministerial tasks with respect to the plan, such as the application of rules determining eligibility for participation, preparation of plan communication materials, the calculation of benefits, and the maintenance of employee records. *See* 29 C.F.R. § 2509.75-8 (1995); *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987). These tasks have been held not to require the exercise of discretionary authority and do not, therefore, implicate any fiduciary duty.

Moreover, because employers often act as both plan administrators and employers, ERISA permits employers to "wear two hats," and not all actions by an employer fall under its fiduciary role. *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1416-17 (2d Cir. 1985) (internal quotation marks omitted), *abrogated on other grounds by* *Mead Corp. v. Tilley*, 490 U.S. 714, 721 (1989). Rather, employers "assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Id.* (internal citations and quotation marks omitted).

Once a defendant's fiduciary status has been determined, the next issue to be resolved is whether the defendant's conduct breached a fiduciary duty. The statute imposes a number of fiduciary duties that relate principally to "the management of

17

plan assets, the maintenance of records, disclosure of specified information, and avoidance of conflicts of interest." See Varity, 516 U.S. at 526 n.5 (Thomas, J. dissenting) (citing Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-43 (1985)).

ERISA contains an elaborate scheme of disclosure requirements, none of which are pertinent to the instant matter.[3] In addition, courts, drawing from the common law of trusts, have interpreted the scope of ERISA fiduciary duties to include a duty to avoid intentional material misrepresentations in plan administrators' communications with plan beneficiaries about the contents of a plan. See, e.g., id. at 506. For example, we have held that fiduciaries may not knowingly or intentionally mislead plan beneficiaries as to changes -- whether effective or under consideration -- to employee benefit plans. See Flanigan, 242 F.3d at 84 ("Fiduciaries may be held liable for statements pertaining to future benefits if the fiduciary knows those statements are false or lack a reasonable basis in fact."); Ballone v. Eastman Kodak Co., 109 F.3d 117, 126 (2d Cir. 1997); Pocchia v. NYNEX Corp., 81 F.3d 275, 278 (2d Cir. 1996); Mullins

---

[3]With respect to disclosure requirements, the statute imposes a "comprehensive set of 'reporting and disclosure' requirements," which comprises part of "an elaborate scheme . . . for enabling beneficiaries to learn their rights and obligations at any time." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995) (citing 29 U.S.C. §§ 1021-31).

18

v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994).[4]

Finally, where a plaintiff asserts a breach of fiduciary claim based on a material misrepresentation or omission, the plaintiff must establish detrimental reliance. King v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus., 131 F. App'x 740 (2d Cir. 2005) (no breach of fiduciary duty where participant did not rely on administrator's alleged misrepresentation). A related concept is that the fiduciary's misrepresentation must be material. That is, there must be a "'substantial likelihood' that the misrepresentation 'would mislead a reasonable employee in making an adequately informed decision about if and when to retire.'" Caputo v. Pfizer, 267 F.3d 181, 192 (2d Cir. 2001) (quoting Ballone, 109 F.3d at 123).

b)  Bell's Breach of Fiduciary Duty Claim

The district court concluded that misrepresentations or omissions relied upon by Bell related solely to the SIP, and, consequently, could not support an ERISA breach of fiduciary duty

---

[4]Fiduciary liability may also arise from a fiduciary's material omissions, or failure to speak. See Pocchia, 81 F.3d at 279. However, our decisions have narrowed a fiduciary's affirmative duty of disclosure to a limited number of circumstances. See, e.g., Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 146-47 (2d Cir. 1997) (holding that plan administrator has no affirmative duty to disclose actuarial valuation reports because it is "inappropriate to infer an unlimited disclosure obligation [under ERISA] on the basis of general provisions that say nothing about disclosure"); Weiss v. Cigna Healthcare, 972 F. Supp. 748, 754 (S.D.N.Y. 1997) (ruling that plan fiduciary not required to disclose "physician compensation arrangements" because such disclosure is not required by ERISA); In re Polaroid ERISA Litigation, 362 F. Supp. 2d 461, 478 (S.D.N.Y. 2005) (same).

19

claim.  We agree.

Nothing in the record supports Bell's claim on appeal that, in 2001 or in 2003, she was misled into believing that she was eligible to retire under Sections 4a, b, or d of the PRAP.  It is true that the terms "retire" or "retirement" were indiscriminately used by PRAP representatives to refer to Bell's intentions and ultimate act of leaving the company, while the PRAP used those words only in connection with Sections 4a, b, and d.  However, the use of "retire" and "retirement" was colloquially correct.  Bell used it herself.  Moreover, the SIP used the terms in the broader sense also.

Most significantly, however, Bell clearly understood that Sections 4a, b, and d did not apply to her.  When Bell first inquired about leaving Pfizer and Malik sent Bell benefit projections based on a retirement age of 55, Bell's emails and phone conversations with Sahni clearly stated that Bell sought information regarding benefits only under the special Pre-1994 benefits plan.  For example, the subject matter of these emails reads:  "Info on pre-'94 benefits w/ retirement at age 50."  (The district court found as a fact that "pre-1994 benefits" was the term used to refer to the "Special Rules" under Section 4k.)  Bell v. Pfizer, 2007 WL 3355386 at *2.

After losing and then regaining interest in leaving Pfizer in 2003, and when McGee sent Bell a "Retirement Kit" that referred to Bell as "an employee who is eligible to retire under

20

[the Plan]," Bell emailed McGee that she was retiring under the special plan, i.e., Section 4k. Finally, Bell testified that she "was clear" she was not leaving Pfizer under Sections 4a, b, or d of the PRAP and that she and her advisor husband knew that she did not fit within those categories.[5] There is no sustainable claim, therefore, that Bell was misled as to her status under the PRAP.

The only misstatement that could have misled Bell was made by Gomez, but only in 2003. When Bell first contacted Gomez in 2001, Bell asked Gomez whether she could retain her stock options "if I retire under the Pfizer retirement annuity plan," and asked further for direction to a "publication" in which "this information can be found." Gomez replied: "yes, those are the general guidelines under the Pfizer annuity plan" and, with regard to the inquiry as to publication, referred Bell to the "Points of Interest" that accompanied every stock option grant.

Gomez's response was accurate given the question posed: the continuation of stock options does generally occur under the "retirement" options offered under the PRAP. In response to Bell's request for a reference to relevant documents, Gomez referred Bell to the "Points of Interest," which both Bell and her husband reviewed prior to Bell's departure from Pfizer.

---

[5]Some of the confusion may have been caused by Bell's following the recommendation of her husband to replace "early retirement" to "retiring under the company's Retirement Annuity Plan" in the April 2003 letter to Jortner. The replacement phrasing was less accurate than the original and more likely to be understood to qualify Bell under the SIP.

These expressly stated that a departing employee's options would expire unless the employee "retired" under Sections 4a, b, or d of the Plan. Thus, not only was there no misrepresentation at this point, but Bell had been provided accurate and dispositive information on her stock option rights if she left Pfizer.

The misstatement as to the status of Bell's stock options came in May 2003, when Gomez mailed Bell a "Stock Option Summary Sheet" that mistakenly designated her as "Retirement Eligible" and indicated that her options would be valid for the life of their respective grants.

As described earlier, this document was prepared and sent as a result of a misunderstanding between McGee and Gomez. When McGee sent the "Retirement Kit" to Bell, McGee also asked Gomez to prepare a summary of Bell's stock options. Gomez did so on the assumption that McGee would have made such a request only if the particular employee was eligible to retire under Sections 4a, b, or d. The summary thus indicated that Bell's stock options would last for the life of the grant and was promptly mailed. The day after the summary was mailed, Bell responded to the "Retirement Kit" by noting that she was actually leaving under the Special Plan and by asking for information about the status of the stock options. McGee did not respond. When Bell received the summary mailed by Gomez, Bell claims to have assumed that it

was a response to Bell's email to McGee.[6] Bell correctly asserts, therefore, that a Plan employee, McGee, was a cause in fact of Bell's claimed loss because McGee caused Gomez to act on an incorrect assumption about Bell's status and to send out an incorrect summary regarding Bell's stock options.

The only issue before us is whether these facts constitute a breach of the fiduciary duty imposed on an ERISA fiduciary. The various state law claims concerning the incorrect information conveyed about Bell's stock options have been withdrawn. That withdrawal limits Bell to the relief authorized under Section 502(a)(3), which is limited to equitable relief, Knudson, 534 U.S. at 207-20, and does not include monetary damages, Coan v. Kaufman, 457 F.3d 250, 264 (2d Cir. 2006). Whether appellees could be ordered to give Bell stock options equivalent to those lost, which would require a purchase, is a question that we do not decide. Also, Bell's ERISA claim raises a host of liability issues that we also do not decide. These include whether a Plan may be liable for unintentional misunderstandings among, or innocent mistakes by, Plan or company employees involving details and calculations concerning termination benefits. Another issue

---

[6]There are no district court findings as to Bell's reliance on the summary. While her version of events is certainly plausible, there is a countercase to be made. The "Points of Interest," which accurately described the effect of early termination on stock options, were received and read by Bell and her husband. Also, although Bell's email to McGee emphasized the importance of the stock options to her retirement decision, she had set a retirement date of June 1, 2003 before receiving Gomez's misleading summary.

we need not reach is a Plan's liability for such errors when fully accurate documents describing those details and calculations have been provided to the beneficiary. The parties here debate that issue in arguing whether Bell's asserted reliance on Gomez's summary was reasonable.

We do not reach these issues because Bell was unintentionally misled, if at all, only as to matters other than the terms of the Plan itself and her status under those terms. While numerous factors other than ERISA pension benefits are critical to a person's retirement decision, advice or misstatements regarding them goes well beyond any duty imposed by ERISA. To be sure, the SIP, in designating those employees eligible to retain their stock options after employment termination, used the employees' status under the PRAP's provisions. But Bell was not misled as to her status under those PRAP provisions. Rather, she was misled, if at all, as to the continuation of her stock options under the SIP.

As Bell concedes, the SIP is not an ERISA plan, but is rather a distinct employment benefit not governed by ERISA. The SIP is: (i) governed by a written document separate from the PRAP; (ii) overseen by a Pfizer committee (i.e., the Pfizer Compensation Committee) that has no authority or responsibility concerning the PRAP or Plan benefits; and (iii) administered by non-Plan employees who bear no responsibility for administering ERISA Plan benefits. The PRAP itself contains no provision

24

providing for employee stock options, save for a provision that excludes stock options from the definition of "Earnings."

In essence, Bell seeks to extend the ERISA fiduciary duty to unintentional misstatements regarding collateral, non-ERISA plan consequences of a retirement decision.[7] The language of the statute weighs against such an extension. The statute states: "a fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries." 29 U.S.C. § 1104 (emphasis added). This language imposes no duties on ERISA fiduciaries with regard to all information relevant to retirement. Further, the "two-hats" doctrine described earlier confines the fiduciary obligation of an employer to actions in its capacity as administrator of the ERISA plan. See Amato, 773 F.3d at 1416-17. In the present case, as noted, the SIP is concededly separate from the PRAP, and Gomez was not acting in any way for Pfizer in its capacity as Plan administrator. Whether Pfizer might be liable for Gomez's actions under a state law tort or contract theory is not before us.

Even where non-ERISA benefits (or exclusion therefrom) turn

---

[7]The issues that arise with regard to intentional misstatements regarding non-ERISA collateral consequences of retirement are quite different from those before us. Intentional misstatements are apt to be self-serving and designed to induce employees to take or forgo some action with respect to plan options. See Varity, 516 U.S. at 506 (Employer breached ERISA fiduciary duty by "knowingly and significantly [] deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries expense"). No such issues arise here because the record shows at most simple misunderstandings resulting in a non-intentional misstatement.

25

on a person's status under an ERISA plan, the ERISA fiduciary duty cannot extend to more than the person's qualification for that status.  If it did, Plan administrators would be forced to search out and master all collateral programs relevant to employment termination, e.g. private medical plans administered by insurance companies and long-term care plans, determine whether they are in any way related to the ERISA plan, and monitor their administration, while often having no power over them.  Beneficiaries might seek (and actually have sought)[8] recovery for misstatements regarding tax consequences, the likely rate of inflation, future interest rates, and the availability of public medical benefits.  The extension of liability to all facts material to retirement decisions would expand -- particularly in an age of notice pleading -- the potential costs of ERISA plans, thereby reducing the number created and the benefits provided in those that are created.

Congress was concerned about the role costs play in determining the creation of plans and the level of benefits provided and wanted to control these costs.  As the Senate Report stated:

---

[8]One court has stated that a failure to advise a potential retiree of the tax consequences of an early retirement plan violated ERISA's fiduciary duty.  Farr v. U.S. West Comm., Inc., 151 F.3d 908, 914-15 (9th Cir. 1998), amended by 179 F.3d 1252 (9th Cir. 1999).  However, it is unclear whether the failure to provide the relevant information in Farr was deliberate and intended to induce the taking of early retirement, facts that would take the decision out of the rule we establish here.

        At the same time, the committee is aware that under our voluntary pension system, the cost of financing pension plans is an important factor in determining whether any particular retirement plan will be adopted and in determining the benefit levels if a plan is adopted, and that unduly large increases in costs could impede the growth and improvement of the private retirement system.  For this reason, in the case of those requirements that add to the cost of financing retirement plans, the committee has sought to adopt provisions which strike a balance between providing meaningful reform and keeping costs within reasonable limits.

S. Rep. No. 93-383 at 14 (1974) reprinted in 1974 U.S.C.C.A.N. 4889, 4904.  Indeed, among the explicit duties the statute charges plan fiduciaries is "defraying reasonable expenses of administration."  29 U.S.C. § 1104(a)(1)(A)(ii); see also, id. §§ 1001a(c)(2) & 1001b(b)(3).

        That increased plan costs are borne by employers, and may dissuade them from creating plans, is a concern that has been recognized by academic commentators and courts alike.  See Edward A. Zelinsky, The Defined Contribution Paradigm, 114 Yale L. J. 451, 476 (2004) ("Compliance with ERISA's [regulations] also entails significant administrative costs for defined benefit arrangements, i.e., actuarial, accounting, and legal fees, costs to which many employers, particularly smaller ones, are quite sensitive. . . . To the extent employers must absorb these extra costs, those costs deter the creation and continuation of defined benefit plans."); Phillip R. Lochner, Jr., Economic Regulation

27

*and Democratic Government*, 25 J. Corp. L. 831, 834 (2000) (commenting on the disappearance of defined benefit plans post-ERISA: "Why should an employer put itself in the position of having to hire numerous lawyers, benefits consultants, accountants, and actuaries, just to be able to tell whether its defined-benefit plan is complying with ERISA?").

Courts have also noted the concern expressed by Congress in enacting ERISA that these costs would provide a disincentive for employers to create pension benefit plans:

> Though Congress was concerned chiefly with protecting the employees' expectations of pension benefits, it also realized that employers would not create, maintain, or expand pension plans if ERISA imposed too much cost. Consequently, the entire statute is a finely tuned balance between protecting benefits for employees while limiting the costs to employers.

*A-T-O, Inc. v. Pension Benefit Guarantee Corp.*, 634 F.2d 1013, 1021 (6th Cir. 1980) (citing S. Rep. No. 94-383 (1974), reprinted in 1974 U.S.C.C.A.N. 5166, 5167).

More recently, in *Conkright v. Frommert*, 130 S. Ct. 1640 (2010), the Supreme Court reiterated its longstanding concern with ERISA litigation expenses. In *Frommert*, the Court addressed the deference that courts should accord to a plan administrator's interpretation of an ERISA plan. Central to the Court's holding was the increased litigation costs associated with de novo review of a plan administrator's decisions as to plan benefits. As the Court explained:

28

> Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. We have therefore recognized that ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans. Congress sought to create a system that is not so complex that administrative costs, or litigation expenses, truly discourage employers from offering [ERISA] plans in the first place. ERISA induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred.

Id. at 1648-49 (internal quotation marks and citations omitted).

Extending ERISA liability to unintentional misstatements regarding non-plan consequences of retirement decisions would run counter to these goals.

                                CONCLUSION

We therefore affirm.

**07-5390-CV**
**Bell v. Pfizer**

**COGAN**, District Judge, dissenting:

This is a case about a company making multiple misrepresentations and omissions to repeated inquiries by one of the plan's beneficiaries, Dr. Diana Bell, regarding its ERISA-regulated retirement plan. Because I conclude that Pfizer was acting in a fiduciary capacity when it made those misrepresentations and omissions, I dissent. I express no view on whether Pfizer's misrepresentations and omissions were material, and whether Bell reasonably relied on them to her detriment, as I believe the district court should address these issues in the first instance. I would therefore remand to the district court for that purpose.

This is a unique case. Pfizer has a special provision in its Retirement Annuity Plan ("PRAP") – Section 4k. This provision allows beneficiaries to end their employment before attaining retirement status and still receive annuity benefits. For individuals like Dr. Bell, understanding Section 4k is critical because in Pfizer's unusual scheme, it determines whether one qualifies for the non-ERISA Stock Incentive Plan ("SIP"). That is, Bell had to understand the difference between ending her employment under Sections 4a, 4b or 4d and ending it under 4k. What she sought to find out was whether Section 4k constituted a form of retirement. Pfizer, mistakenly, led her to believe that it was.

The majority finds it significant – indeed determinative – that Bell asked Pfizer about Section 4k not because she was confused about her eligibility, but because the meaning of this provision bore on her rights under the SIP. The majority reasons that because Bell knew for which PRAP section she qualified, Pfizer's fiduciary duty was at its end. It holds that an unintentional misrepresentation made by a company interpreting a provision of its retirement plan, is not a misrepresentation of the plan within the meaning of ERISA. In reaching this

1

conclusion, the majority adds a new layer of analysis to an ERISA challenge, which focuses on a beneficiary's reasons for requesting information about a retirement plan. I find no support for this reading of the statute.

To begin with, I disagree with the district court's finding, which the majority adopts, that Pfizer's misrepresentations and omissions relied upon by Bell, "related solely to the SIP, and, consequently, could not support an ERISA breach of fiduciary duty." And I disagree with the majority's related premise that only *one* misstatement could have misled Bell – the one made by Gomez in 2003 when she sent Bell the stock option summary, identifying Bell as "retirement eligible" and discussing Bell's stock option rights based on this classification. That was certainly one misrepresentation but there were others, including omissions regarding Bell's eligibility to retire under the PRAP. For instance, the May 6, 2003 letter to Bell from Peggy McGee, retirement counselor, enclosing her Retirement Kit, referred to Bell as an "employee eligible to retire under the [PRAP]." This statement was clearly incorrect; the PRAP itself defines "retire" or "retirement" as "the termination of service . . . after meeting the requirements of Section 4a, b, or d," and there is no dispute that Bell did not meet the requirements of any of these sections.

Additionally, the fact that the company's personnel database initially listed Bell as "retired," and that her status was not changed to "terminated" until after August 2003, further demonstrates the initial confusion within the company as to Bell's retirement status. An August 19, 2003 email chain originating between Michaeline Von Drathen and McGee, flagging a potential error by the retirement hotline in processing Bell's retirement inquiry, and culminating in a Pfizer employee, Deb Alexander's clear statement to McGee and Geronimo Colon (Pfizer's manager of PRAP Administration) that Bell was "NOT eligible for retirement . . . the Retirement

2

status in PeopleSoft [is] not correct," further supports the conclusion that Pfizer's retirement counselors misrepresented Bell's eligibility for retirement both internally and to Bell.

In addition to these affirmative misrepresentations, the record also contains evidence of omissions regarding Bell's eligibility to retire under the PRAP, which the district court did not address and the majority overlooks. For example, the record reflects that Sasni and Malik, employees in Pfizer's HR and pension benefits administration departments, knew that Bell planned to take "retirement at age 50," but never told Bell that her plan was not actually considered "retirement" under the PRAP. Likewise, Corbett, an HR manager, knew that Bell intended to retire before age 55; while Corbett advised her that she was not eligible for medical benefits prior to age 55, she did not advise her that neither was she eligible for "retirement" as the PRAP defined it. Bell also explicitly told McGee, a person designated by Pfizer as a retirement counselor whose job it was to field retirement questions for its employees, that she intended to leave the company prior to age 55 and take the pre-1994 benefits. Not only did McGee never advise Bell that she was not eligible to retire (as McGee testified was her normal practice when an ineligible employee asked for retirement information), she entirely failed to answer one of Bell's most specific questions about whether eligibility for the pre-1994 benefit qualified her as "retired" under the PRAP in the sense that she could retain favorable treatment of her stock options. These omissions all concern Bell's eligibility to retire under the PRAP; their absence from the district court's factual analysis further demonstrates the insufficiency of its analysis.

The majority's analysis begins by observing that Pfizer's employees use the terms "retire" and "retirement" correctly in the colloquial sense (referring to Bell's leaving the company), and that Bell used the words loosely herself. It also notes that "Bell clearly

3

understood that Sections 4a, b, and d did not apply to her." I find these observations irrelevant given the fiduciary's duty to provide "full and accurate information . . . regarding the administration of the plan," In re Long Island Lightning Co., 129 F.3d 268, 271 (2d Cir. 1997), including "complete and accurate information about . . . retirement options." Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 10 (2d Cir. 1997); see also, Switzer v. Wal-Mart Stores, Inc., 52 F.3d 1294, 1299 (5th Cir. 1995); Electro-Mechanical Corp. v. Ogan, 9 F.3d 445, 451 (6th Cir. 1993); Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 991 (7th Cir. 1993); Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993); Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C. Cir. 1990). First, there is no safe harbor under ERISA allowing for the ascription of colloquial meaning as opposed to proper definition of plan terms. Second, there is nothing in the statute or the caselaw to suggest that a fiduciary's level of accuracy should be calibrated to the beneficiary's remarks or knowledge; the meaning of "complete and accurate" does not change based on the beneficiary's state of mind. Whether Pfizer's statements were material or whether Bell relied on them to her detriment – perhaps because she had sufficient information, expertise, and opportunity to avoid the misunderstanding – are not questions before this court and are properly decided on remand.

The thrust of the majority's holding is that the ERISA fiduciary duty does not extend to "unintentional misstatements regarding collateral, non-ERISA plan consequences of a retirement decision."[1] In reaching this conclusion, the majority rests on the language of the statute and the "two-hats" doctrine, which allows employers to escape fiduciary status when they are not acting as PRAP administrators, and instead conduct business that is not regulated by ERISA.

I do not see how a fiduciary is not discharging its duties "with respect to a plan," 29 U.S.C. § 1104, when it is interpreting – or misinterpreting – key terms in its provisions. That

---

[1] The opinion makes the point that *intentional* misstatements may be different.

4

those misrepresentations and omissions may have non-ERISA consequences does not foreclose liability for breach of fiduciary duty. See e.g., Farr v. U.S. West Commc'ns, Inc., 151 F.3d 908, 914-15 (9th Cir. 1998) (finding a violation of ERISA's fiduciary duty for failing to advise a potential retiree of the tax consequences of an early retirement plan), amended, 179 F.3d 1252 (9th Cir. 1999).

Nor do I agree that the two-hats doctrine saves Pfizer from liability. The majority bases this part of its holding on the finding that Gomez, whom "McGee caused to act on an incorrect assumption about Bell's [retirement] status," was not acting as a PRAP administrator. Determining whether an employer acted as plan administrator requires a context-specific inquiry into (1) the factual circumstances in which the employer was acting; (2) whether the activity in which the employer engaged was plan-related; and (3) whether the activity was "engaged in by those who had plan-related authority to do so." Varity Corp. v. Howe, 516 U.S. 489, 503 (1996). Plan-related activities that may give rise to an employer's ERISA fiduciary duty include communicating to employees about future plan benefits, Flanigan v. Gen. Elec. Co., 242 F.3d 78, 84 (2d Cir. 2001), and "answering beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits." Varity, 516 U.S. at 502-03.

If a reasonable employee could think that the employer was communicating with her in both its capacity as an employer and its capacity as a plan administrator, the employer can be found to be acting as an ERISA fiduciary. See e.g., Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 65 (2d Cir. 2006) (quoting Varity, 516 U.S. at 504-05). Thus, this court has previously found that the communications between employees and benefits counselors designated by the employer to give plan advice can give rise to an ERISA fiduciary duty. See

5

Becker, 120 F.3d at 10 (finding a breach of ERISA fiduciary duty based in part on misrepresentations and omissions made by a benefits counselor); see also Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993) (noting an employer cannot avoid fiduciary liability by walling off "those employees on whom plan participants reasonably rely for important information and guidance about retirement"). It seems to me that if a plan fiduciary wants to wear two hats, it is incumbent upon him to make it clear to beneficiaries which hat he is wearing when he gives advice, especially when both hats have common features.

Because Pfizer's misrepresentations and omissions concerned Bell's eligibility to retire under the ERISA-governed PRAP, the interactions between Bell and company employees concerning the PRAP gave rise to a fiduciary duty if the Pfizer employees were acting as PRAP administrators, or if Bell could reasonably have perceived them to be acting in such a capacity. I would find that Pfizer employees acted as PRAP administrators for both reasons. In contrast to the "ministerial functions" that do not implicate an entity's fiduciary duties under the statute and that the district court in this case found Pfizer employees to have been performing, the majority of the PRAP administrators and retirement counselors with whom Bell interacted gave detailed advice in response to her specific benefits-related inquiries. The context-specific nature of these interactions removes them from the realm of the mechanical or ministerial, and makes them administrative in nature. See e.g., Varity, 516 U.S. at 502-03 (noting that answering beneficiaries' questions about the meaning of plan terms to help beneficiaries obtain plan benefits is one of the functions of a fiduciary).

And Bell could reasonably have concluded that she was communicating with Pfizer-the-PRAP-administrator, not Pfizer-the-employer, when she made her retirement eligibility inquiries. She originally initiated contact with Pfizer's HR department after receiving a pamphlet from

6

Pfizer advising her that its "retirement counselor can answer all your retirement questions." Likewise, when Bell ultimately made her decision to retire, she called Pfizer's retirement hotline at the direction of an HR supervisor. McGee, an individual specifically designated by Pfizer as someone who could advise employees about the mechanics of retirement, interacted with Bell as her retirement counselor, and answered Bell's questions about her specific retirement needs. Indeed, the pamphlet Bell originally received in 2001 stated that the "retirement counselor is now your primary source for information about . . . provisions of the [PRAP]" and could advise her, among other things, of the "impact of retirement on benefits." Bell could have reasonably concluded that these employees "had expert knowledge about how their plan worked," and reasonably could have relied on them for their expertise. Varity, 516 U.S. at 503; Fischer, 994 F.3d at 535. The employees had the apparent authority to bind Pfizer as fiduciary. See Estate of Dermady v. Eastman Kodak Co., 136 F. Supp. 2d 181, 188–89 (W.D.N.Y. 2001).

I share the majority's concern with extending potential liability for ERISA plans. But as I noted earlier, this is a unique case – Pfizer's stock option plan cross-references its retirement plan, and the retirement plan in turn has an unusual provision that allows collection of benefits without attaining retirement status. Nor am I ready to conclude whether Bell detrimentally relied on material misrepresentations, which the majority correctly points out would be another bar to liability. Thus this is not a case that will expand ERISA beyond congressional intent; it is a case that squarely falls within the language of the statute. The employees who misrepresented parts of the PRAP to Bell were the very ones responsible for discharging the plan. The facts may be unusual, but the misrepresentations are unmistakable. I therefore respectfully dissent.

7