15-3602-cv
Osberg v. Foot Locker, Inc.

**UNITED STATES COURT OF APPEALS**
FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: January 25, 2017   Decided: July 6, 2017)

Docket No. 15-3602-cv

GEOFFREY OSBERG, on behalf of himself
and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

— v. —

FOOT LOCKER, INC., FOOT LOCKER RETIREMENT PLAN,

*Defendants-Appellants.*

B e f o r e :

WINTER, CABRANES, and LYNCH, *Circuit Judges.*

Defendants-appellants Foot Locker, Inc. ("Foot Locker" or the "Company") and Foot Locker Retirement Plan (together with Foot Locker, "Defendants") appeal from a judgment entered by the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*). Following a two-week bench trial, the district court held that Foot Locker violated §§ 102 and

404(a) of the Employee Retirement Income Security Act ("ERISA") by, *inter alia*, failing to disclose "wear-away" caused by the Company's introduction of a new employee pension plan – a phenomenon which effectively amounted to an undisclosed freeze in pension benefits. Drawing on its equitable power under § 502(a)(3) of ERISA, the district court ordered reformation of the plan to conform to plan participants' reasonably mistaken expectations, which the district court found to have resulted from Foot Locker's materially false, misleading, and incomplete disclosures.

On appeal, Defendants do not challenge the district court's determination that Foot Locker violated ERISA. Instead, they quarrel with the district court's award of equitable relief under § 502(a)(3), arguing that the district court erred by: (1) awarding relief to plan participants whose claims were barred by the applicable statute of limitations; (2) ordering class-wide relief on participants' § 404(a) claims without requiring individualized proof of detrimental reliance; (3) concluding that mistake, a prerequisite to the equitable remedy of reformation, had been shown by clear and convincing evidence as to all class members; and (4) using a formula for calculating relief that resulted in a windfall to certain plan participants. For the reasons that follow, we reject Defendants' challenges to the district court's award of equitable relief and AFFIRM the judgment of the district court.

---

JULIA PENNY CLARK, Bredhoff & Kaiser, PLLC, Washington, DC (Eli Gottesdiener, Gottesdiener Law Firm, PLLC, Brooklyn, NY, *on the brief*), *for* Plaintiff-Appellee Geoffrey Osberg.

MYRON D. RUMELD, Proskauer Rose LLP, New York, NY (Mark D. Harris, Proskauer Rose LLP, New York, NY; Robert Rachal, Proskauer Rose LLP, New Orleans, LA; John E. Roberts, Proskauer Rose LLP, Boston, MA; Amir C. Tayrani, Gibson, Dunn & Crutcher LLP, Washington, DC, *on the brief*), *for* Defendants-Appellants Foot Locker, Inc., Foot Locker Retirement Plan.

EIRIK CHEVERUD, Trial Attorney (M. Patricia Smith, Solicitor of Labor; G. William Scott, Associate Solicitor; Elizabeth Hopkins, Counsel for Appellate and Special Litigation, *on the brief*) *for* Amicus Curiae Thomas E. Perez, Secretary of the United States Department of Labor, Washington, DC, in support of Plaintiff-Appellee.

Dara S. Smith, AARP Foundation Litigation, Washington, DC *for* Amicus Curiae AARP, in support of Plaintiff-Appellee.

Evan Miller, Jones Day, Washington, DC, Lauren P. Ruben, Jones Day, New York, NY *for* Amici Curiae the American Benefits Council, the ERISA Industry Committee, and the Chamber of Commerce of the United States of America, in support of Defendants-Appellants.

---

GERARD E. LYNCH, *Circuit Judge*:

Defendants-appellants Foot Locker, Inc. ("Foot Locker" or the "Company") and Foot Locker Retirement Plan (together with Foot Locker, "Defendants") appeal from a judgment entered by the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*). Following a two-week bench trial, the district court held that Foot Locker violated §§ 102 and 404(a) of the Employee Retirement Income Security Act ("ERISA") by, *inter alia*, failing to disclose "wear-away" caused by the Company's introduction of a new

3

employee pension plan – a phenomenon which effectively amounted to an undisclosed freeze in pension benefits. Drawing on its equitable power under § 502(a)(3) of ERISA, the district court ordered reformation of the plan to conform to plan participants' reasonably mistaken expectations, which the district court found to have resulted from Foot Locker's materially false, misleading, and incomplete disclosures.

On appeal, Defendants do not challenge the district court's determination that Foot Locker violated ERISA. Instead, they quarrel with the district court's award of equitable relief under § 502(a)(3), arguing that the district court erred by: (1) awarding relief to plan participants whose claims were barred by the applicable statute of limitations; (2) ordering class-wide relief on participants' § 404(a) claims without requiring individualized proof of detrimental reliance; (3) concluding that mistake, a prerequisite to the equitable remedy of reformation, had been shown by clear and convincing evidence as to all class members; and (4) using a formula for calculating relief that resulted in a windfall to certain plan participants. For the reasons that follow, we reject Defendants' challenges to the district court's award of equitable relief and AFFIRM the judgment of the district court.

4

## BACKGROUND

### I.     Factual Background

The facts as found by the district court in ruling that Foot Locker violated

§§ 102 and 404(a) of ERISA are not in dispute, *see Osberg v. Foot Locker, Inc.*

("*Osberg II*"), 138 F. Supp. 3d 517 (S.D.N.Y. 2015), and we recite only those

necessary to explain our resolution of this appeal. Effective January 1, 1996, Foot

Locker converted its employee pension plan from a defined benefit plan to a cash

balance plan. Under the defined benefit plan, participants had been entitled to an

annual benefit beginning at age 65 that was calculated on the basis of their

compensation level and years of service. The benefit took the form of an annuity,

and, with exceptions not relevant here, employees were not given the option to

receive its aggregate value as a lump sum. In contrast, under the newly-

introduced cash balance plan, participants held a hypothetical account balance

that, upon retirement, could be paid out as a lump sum or used to purchase an

annuity.

The switch to a cash balance plan required Foot Locker to convert

participants' existing accrued benefits into a figure that would be used to

calculate their initial account balances under the new plan. For that conversion,

Foot Locker used a formula that guaranteed that the vast majority of participants' initial account balances would be worth *less* than the value of their accrued pension benefits under the old plan.[1] Specifically, the formula proceeded by: (1) calculating the aggregate value as of December 31, 1995 of the annuity that a participant would have received at age 65 under the old plan; (2) discounting that aggregate value to its value as of January 1, 1996 to reflect the time value of money; and (3) applying a mortality discount to the January 1, 1996 present value to reflect the possibility that the participant might not live to age 65. At steps one and two of the conversion, a nine-percent discount rate was used, but following conversion, participants received pay credits and an interest credit at only six percent under the new plan. The district court found that the disparity meant that most participants' account balances would lag behind the value of their old benefits for some period of time – in many cases, for years.

To address that problem, the cash balance plan included a stopgap measure that defined a participant's actual benefits as the greater of: (1) the

---

[1] As explained in more detail below, approximately 1.4 percent of participants did not suffer from wear-away, at least as measured on a lump sum rather than annuity basis, due to their receipt of seniority enhancements that made their initial account balances under the new plan higher than the value of their accrued benefits under the defined benefit plan. *See infra* Part IV.

participant's benefits under the defined benefit plan as of December 31, 1995; and (2) the participant's benefits under the new cash balance plan. The "greater of" provision had the benefit of ensuring that participants would not lose money due to Foot Locker's switch to a cash balance plan, consistent with ERISA's ban on plan amendments that reduce a participant's "accrued benefit," which is known as the "anti-cutback" rule, 29 U.S.C. § 1054(g). But it also meant that participants' actual benefits would remain effectively frozen for some period of time following conversion. That is, until participants earned enough pay and interest credits to close the gap between the value of their cash balance account and their old benefits, their actual benefits would remain frozen at the value of their old benefits due to the operation of the "greater of" provision. During that period, any pay and interest credits earned by a participant would not increase his or her actual benefits, but merely reduce the gap between the value of the participant's cash balance account and the participant's old benefits. That phenomenon – the fact that a participant's actual pension benefits did not increase despite continued employment – is known in the benefits industry as "wear-away." *See, e.g.*, *Amara v. CIGNA Corp.* ("*Amara II*"), 775 F.3d 510, 516 (2d Cir. 2014).

7

The history of the adoption of the cash balance plan makes clear that Foot Locker's management recognized that conversion to the new plan would cause wear-away for most of its employees, but embraced the phenomenon as a cost-cutting measure. In late 1994 or early 1995, following a request from Foot Locker's then-chief executive officer, Roger N. Farah, a task force of four employees had been formed to investigate cost savings that could be generated from changes to Foot Locker's employee pension plan. All four members of the task force testified at trial, including its leader, Patricia Peck, who was ultimately responsible for deciding which changes to propose to management. Peck, whom the district court found "particularly credible," *Osberg II*, 138 F. Supp. 3d at 526 n.11, testified that she understood that her mission was to cut costs rather than to improve plan benefits, and that the changes she proposed to senior management would result in cost savings by causing a freeze in pension benefits. Peck's presentations to senior management expressly stated that the proposed changes would lead to "decreases in future company costs" at the expense of a "permanent loss of retirement benefits." *Id.* at 528 (brackets and internal quotation marks omitted). As the district court found, Foot Locker viewed announcing a benefits freeze as a "morale killer," and "[c]onversion to a cash

8

balance plan had the advantage of being able to obscure what was an effective freeze, without the accompanying negative publicity, loss of morale, and decreased ability to hire and retain workers." *Id.* (internal quotation marks omitted). The changes were approved by Foot Locker's senior management and board of directors in July and September 1995, respectively.

Foot Locker introduced the new cash balance plan to its employees in a series of written communications, all of which the district court found to have "failed to describe wear-away," to have "failed to clearly discuss the reasons for the difference" between the value of a participant's old and new benefits, and to have been "intentionally false and misleading." *Osberg II*, 138 F. Supp. 3d at 529. For example, in a letter dated September 15, 1995, the Company's senior management announced that it was "excited" to introduce "important changes" to Foot Locker's employee pension plan that would give participants "a more competitive retirement benefits package" and "more flexibility and a better ability to monitor their benefits." J.A. 2137. The letter also stated that participants would be able "to see their individual account balance grow each year, and know its value." *Id.* Peck acknowledged in her testimony that the September 1995 letter was designed to be a "good news letter" even though she and senior

management understood that the conversion would result in an effective freeze of pension benefits for most participants, and that she made an "affirmative decision," consistent with senior management's wishes, not to include the "bad news" of wear-away in the letter. J.A. 1936.

The fact of wear-away was also deliberately left out of later communications sent to participants, including the December 1996 summary plan description ("SPD") – a document that "ERISA contemplates . . . will be an employee's primary source of information regarding employment benefits," *Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001) (brackets and internal quotation marks omitted). While the SPD provided a general description of the methodology by which participants' account balances would be calculated under the cash balance plan,[2] it lacked any description of wear-away or any indication

---

[2] Specifically, the SPD explained, *inter alia*, that a participant's "account balance" under the cash balance plan would be based on an "initial account balance . . . equal to the actuarial equivalent lump sum value of your accrued benefit under the Plan as of December 31, 1995" plus "interest" and "compensation credits, which are based on years of service and a percentage of compensation." J.A. 2155-56 (emphases omitted). The SPD's definitions section elaborated on the conversion formula, stating that the initial account balance "is determined actuarially based upon a 9% rate of interest and the mortality table set forth in IRS rulings." *Id.* at 2150 (emphases omitted). The SPD also summarized the "greater of" provision, stating that a participant's "accrued benefit at the time . . . employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as of December 31, 1995." *Id.* at 2156 (emphases omitted).

10

that the conversion would cause a benefits freeze for most participants. In fact, the district court found that the SPD and other Foot Locker communications not only failed to disclose wear-away, but "were designed to conceal that information." *Osberg II*, 138 F. Supp. 3d at 537. The SPD, for example, "falsely indicated to [p]articipants that their actual retirement benefits were fully reflected in the[] account balances" to which their pay and interest credits would apply, *id.* at 531, when in fact any participant whose account was in wear-away would instead receive the frozen value of the benefits they had accrued under the old plan for a period of time that could extend for years. Similarly, the Highlights Memo distributed in November 1995 stated that participants would, upon retirement, "have the option of taking the lump sum payment equal to your account balance," which the district court found to "obscure[] the fact that the accrued benefit was the sole true benefit for anyone in wear-away." *Id.* at 530 (internal quotation marks omitted). That false impression was further reinforced by "total compensation" statements that participants began receiving annually and which showed participants' account balances increasing each year due to the receipt of pay and interest credits.

11

Foot Locker's efforts to conceal wear-away were apparently successful. The district court found that "not a single employee ever complained about [wear-away]," *id.* at 535, and numerous class members – including Michael Steven, the former chief financial officer of the Company's Woolworth division, as well as Foot Locker employees whose job responsibilities involved calculating pension benefits – testified at trial that they did not understand that the conversion to a new pension plan had effectively frozen their retirement benefits. Steven testified, for example, that while he requested and received an individualized statement showing the calculations underlying his account balance and the lump sum payment that he could receive upon retirement, he did not realize – even upon seeing the difference between those two numbers – that his actual retirement benefits had remained frozen despite his continued employment. In the words of the district court, "[f]rom the CFO of Woolworth stores to a cashier, no one understood what was going on." *Id.* at 537.

## II.      Procedural History

In 2007, plaintiff-appellee Geoffrey Osberg ("Plaintiff") brought suit against Defendants on behalf of a proposed class of plan participants and beneficiaries claiming, *inter alia*, that Foot Locker violated §§ 102 and 404(a) of

ERISA by failing to disclose that conversion to the cash balance plan would cause wear-away, and sought relief under § 502(a) of ERISA. In 2012, the district court granted summary judgment to Defendants, basing that ruling in part on Plaintiff's failure to show "actual harm," which the district court held was a prerequisite to the equitable remedies of reformation and surcharge. On appeal, we ruled that the district court erred in requiring proof of actual harm for the equitable remedy of reformation and declined to reach the question of whether such proof was required for the equitable remedy of surcharge. *Osberg v. Foot Locker, Inc.* ("*Osberg I*"), 555 F. App'x 77, 80-81 (2d Cir. 2014). We also declined to determine whether Plaintiff's § 102 claim was subject to a three- or six-year statute of limitations, and affirmed the district court's dismissal of Plaintiff's claim under § 204(h) of ERISA. *Id.* at 79-80.

Upon remand, the district court certified a class of plan participants and their beneficiaries under Federal Rule of Civil Procedure 23(a) and 23(b)(3), and held a two-week bench trial in July 2015 at which twenty-one fact witnesses and three expert witnesses testified, some by deposition. In October 2015, the district court ruled that Foot Locker had violated §§ 102 and 404(a) of ERISA and ordered that the plan be reformed pursuant to § 502(a)(3) to conform to participants'

mistaken but reasonable beliefs. *Osberg II*, 138 F. Supp. 3d at 560. Specifically, the district court found that participants believed that they would receive the full value of the benefits that they had earned under the defined benefit plan for their service through December 31, 1995 *plus* the benefits that Foot Locker told participants that they would earn beginning on January 1, 1996 under the cash balance plan – that is, credits for continued service and interest, as well as a one-time seniority enhancement available to those who were at least age 50 and had at least 15 years of service on December 31, 1995. *Id.* at 560-61. Accordingly, the district court ordered that participants receive: (1) an "A benefit," consisting of an initial account balance as of January 1, 1996 equivalent to the value of their benefits under the defined benefit plan as of December 31, 1995, discounted to present value using a six-percent rate and without the application of a mortality discount; and (2) a "B benefit," consisting of continued service and interest credits, a one-time seniority enhancement for those eligible that would be applied to the initial account balance as calculated in the "A benefit," and certain adjustments required under federal law.[3] *Id.*

---

[3] The district court specifically used the terminology "A benefit" to refer to the benefits available under the defined benefit plan, and "B benefit" to refer to the benefits available under the cash balance plan. *Osberg II*, 138 F. Supp. 3d at 525 n.9. For

The district court entered final judgment on October 5, 2015. This timely appeal followed.

## DISCUSSION

We reverse a district court's award of equitable relief "only for an abuse of discretion or for a clear error of law." *Amara II*, 775 F.3d at 519, quoting *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1214 (2d Cir. 1993). Where the award of equitable relief is supported by findings of fact, such findings are reviewed for clear error. *Amara II*, 775 F.3d at 519. Where the award relies on conclusions of law, those legal conclusions are reviewed de novo. *Id.*

## I. Statute of Limitations

In challenging the district court's award of equitable relief, Defendants first contend that the district court erred when it granted relief to participants whose claims under §§ 102 and 404(a) were time-barred.[4] "We review the question of the application of the relevant statute of limitations – as we do all questions of law – de novo." *Novella v. Westchester Cty.*, 661 F.3d 128, 143 (2d Cir. 2011).

consistency, we adopt the same terminology, though we note, as discussed in more detail below, that the relief ordered by the district court here differs in certain respects from the "A+B benefits" approved in *Amara II*. *See infra* n.16.

[4] During oral argument, Defendants clarified that, in advancing their statute of limitations arguments, they did not intend to challenge the district court's class certification rulings.

**A. Timeliness of § 102 Claims**

Section 102 of ERISA requires, *inter alia*, that a summary plan description be "written in a manner calculated to be understood by the average plan participant" and be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). Defendants argue that participants were put on constructive notice of wear-away (and thus on notice of their claims under § 102 for the SPD's failure to disclose wear-away) when they received lump sum payments upon retirement that *exceeded*, for reasons explained below, their account balances under the new pension plan. Defendants argue, accordingly, that the clock on participants' § 102 claims began running upon retirement, rendering untimely the claims of participants who left Foot Locker more than three years before this suit was brought.[5]

---

[5] In our prior summary order affirming in part and vacating in part the district court's summary judgment ruling, we declined to determine whether Plaintiff's § 102 claim was subject to a three- or six-year statute of limitations. *Osberg I*, 555 F. App'x at 80. Following remand, the district court adhered to its decision that a three-year statute of limitations applied to class members' § 102 claims. *Osberg II*, 138 F. Supp. 3d at 559. Because our rejection of Defendants' constructive notice argument makes it unnecessary to determine the limitations period applicable to a § 102 claim, we do not resolve that question here.

In determining when the statute of limitations begins to run in the analogous context of an ERISA miscalculation claim, we have applied a "reasonableness approach" that looks to "when there is enough information available to the pensioner to assure that he knows or reasonably should know of the miscalculation." *Novella*, 661 F.3d at 147 & n.22. That approach does not require a participant to "confirm the correctness of his pension award immediately upon the first payment of benefits." *Id.* at 146. Where, however, the miscalculation is "apparent from the face of a payment check" or "readily . . . discoverable from information furnished to pensioners by the pension plan," a court may conclude that the participant had enough information at the time of the first payment of benefits to assure that he reasonably should have known of the miscalculation. *Id.* at 147 n.22.

In analyzing the accrual of the § 102 claims at issue here, we adopt the *Novella* framework, which is an elaboration of the federal discovery rule generally applicable to ERISA claims. *See Novella*, 661 F.3d at 144; *see also Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007); *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 48 (2d Cir. 1999). Accordingly, we ask in this case whether a participant would have had "enough information . . . to assure that he

17

kn[ew] or reasonably should [have] know[n]" of the existence of wear-away at the time that the participant received the lump sum payment. *Novella*, 661 F.3d at 147.

Defendants' constructive notice argument proceeds as follows. Upon retirement, participants were each sent a statement that showed their account balance and asked whether the participant wished to receive his or her pension benefits in the form of a lump sum payment or an annuity. For participants whose accounts were experiencing wear-away at the time of retirement, the value of the lump sum payment *exceeded* the value of their cash balance account. Osberg, for example, received a "Pension Options Form" upon retirement that showed his "[a]ccount [b]alance" to be $20,093.78, but stated that he could "select one of the following forms of benefits available to [him]": a lump sum payment of $25,695.96 or an annuity of $138.41. J.A. 2563. At that point, Defendants argue, participants should have realized that something was amiss and consulted the plan communications that they had received over the years to piece together the fact that their accounts had been suffering from wear-away.

But arriving at that realization was far from straightforward. As a threshold matter, participants would have had not only to notice the disparity

18

between the lump sum payment and account balance, but also to recognize that the disparity had some significance worth further investigation. For participants who had been assured by Foot Locker that they were receiving "a more competitive retirement benefits package" in which their account balance would "grow each year," *id.* at 2137, the fact that they were receiving the larger of two numbers on a page would not necessarily make "apparent" to them that their benefits had in fact been frozen for months or years, *Novella*, 661 F.3d at 147 n.22; *cf. Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 816 (7th Cir. 2010) (rejecting the argument that a lump sum payment served as a "red flag" that the participant had been underpaid where the payment was not "so inconsistent" with the participant's understanding of her benefits "as to serve as a clear repudiation").

Even assuming that participants picked up on the disparity, in order to discover wear-away, participants would still have had to make a sophisticated chain of deductions about the meaning of the information on their statements and the mechanics underlying their benefits, with the opaque guidance contained in the SPD as their guide. Specifically, a participant would have had to deduce at the very least that: (1) the "account balance" on the pension options form

19

represented the value of his cash balance account, whereas the lump sum payment represented the value of the benefits he had earned under the old plan; (2) the actual value of his benefits was determined on the basis of a "greater of" provision that set a participant's benefits at the greater of the value of his account balance and old plan benefits; (3) the pay and interest credits he had earned since January 1, 1996 applied only to his account balance; and (4) because of the operation of the "greater of" provision, his benefit had not increased since January 1, 1996, despite his receipt of pay and interest credits, since his actual benefits had remained frozen at the value of his old benefit.[6]

That is a heroic chain of deductions to expect the average plan participant to make, particularly on the basis of materials that were designed by Foot Locker to conceal from participants the very phenomenon that Defendants now argue should have been "readily . . . discoverable." *Novella*, 661 F.3d at 147 n.22. Indeed,

---

[6] Participants would have also had to avoid drawing the conclusion from the SPD that the difference between their account balance and the lump sum payment was due to the operation of federal law and IRS regulations. *See, e.g.*, J.A. 2156 ("The lump sum payable to you is the greater of your account balance or the amount determined by multiplying the annuity payable to you by factors required by federal law and IRS regulations." (emphasis omitted)); *id.* at 2158 ("The lump sum payable to you is the greater of your account balance or the amount determined under federal law and IRS regulations." (emphasis omitted)).

as discussed above, even after noticing the disparity identified by Defendants and having the benefit of an individualized explanation of the calculations used to arrive at his account balance and expected lump sum payment, the CFO of the Company's Woolworth division was not able to divine that his account was suffering from wear-away. To expect the average plan participant, who the district court found had a high-school level of education, to do so on the basis of the opaque guidance in the SPD would be unreasonable. Accepting Foot Locker's argument, moreover, would effectively impose upon participants an obligation to identify problems such as wear-away "immediately upon the first payment of benefits, regardless of the complexity of the calculations, or of the adequacy of the defendants' explanation of the basis for the calculation" – a rule that we rejected in *Novella* as "too harsh." *Id.* at 146. Such a rule, we reasoned, would place the burden on the party "less likely to have a clear understanding of the terms of the pension plan." *Id.* In this case, it is not merely "likely," but indeed certain, that plan participants would have a muddled understanding of wear-away, given that Foot Locker took steps to conceal the phenomenon from participants.

21

Defendants and their *amici* fall back on the argument that failing to start the clock on participants' § 102 claims at the time of the payment of the lump sum would "eviscerate[] the constructive-notice standard" and result in a statute of limitations that does not run "until a lawyer approaches a potential plaintiff with a detailed roadmap for impending litigation." Br. for *Amici Curiae* Am. Benefits Council et al. 24. In many circumstances, such concerns are not entirely without merit. In *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600 (7th Cir. 2011), the Seventh Circuit embraced an accrual rule that would start the clock on an ERISA claim when a lump sum payment of benefits was made, noting that to hold otherwise would allow plaintiffs "to slip by with no accrual date" and effectively "nullif[y] . . . the statute of limitations." *Id.* at 607. But those concerns have significantly less purchase where a plan fiduciary intentionally makes misstatements and omissions to conceal an injury from plan participants, as *Thompson* recognized by expressly stating that its ruling did not contemplate a scenario where "the injury was somehow concealed" from plan participants. *Id.* at 607 n.9. In this case, participants faced obstacles to the discovery of their injury placed in their path by the very party charged with disclosing to participants "in a manner calculated to be understood by the

average plan participant" all "circumstances which may result in . . . loss of benefits." 29 U.S.C. § 1022(a), (b). Foot Locker failed plan participants not only by failing to disclose the fact of wear-away, but also by suggesting to participants that they had introduced a more competitive benefits package in which they would see their account balance grow each year. Under such circumstances, the assertion that participants "bur[ied] [their] head[s] in the sand" and "closed their eyes to evident and objective facts" in failing to discover wear-away is not persuasive. Br. for *Amici Curiae* Am. Benefits Council et al. 22, 24. Accordingly, for all the foregoing reasons, we hold that the district court did not err in rejecting Defendants' challenge to the timeliness of participants' § 102 claims.[7]

---

[7] In challenging the timeliness of participants' § 102 claims, Defendants also argue that certain "individualized" communications received by some participants provided constructive notice of wear-away. Those communications primarily consist of (1) written materials distributed to participants during meetings held by Foot Locker's corporate benefits department, and (2) written responses provided to participants inquiring about various aspects of the new employee pension plan. None of the communications identified by Defendants expressly discussed wear-away, and while they, like the SPD, provided some explanation of the calculations underlying participants' pension benefits, none supply "enough information . . . to the [participant] to assure that he . . . reasonably should [have] know[n]" that his account was suffering from wear-away, even when combined with the class-wide and other individualized communications. *Novella*, 661 F.3d at 147. Accordingly, for substantially the same reasons that we reject Defendants' arguments concerning the constructive notice provided by the lump sum payment, we reject Defendants' contention that individualized communications provided constructive notice to participants of their § 102 claims.

**B. Timeliness of § 404(a) Claims**

Defendants also challenge the district court's ruling that participants'

breach of fiduciary duty claims under § 404(a) were not time-barred. The

limitations period for such claims is governed by § 413 of ERISA, which applies a

discovery rule "in the case of fraud or concealment" that allows a § 404(a) claim

to be brought "not later than six years after the date of *discovery* of such breach or

violation." 29 U.S.C. § 1113 (emphasis added). In this Circuit, "fraud or

concealment" is read disjunctively, such that the exception applies in cases of

fraud *or* concealment. *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001); *cf. id.*

at 188-89 (cataloguing circuits adopting the contrary view that the exception

should be read conjunctively and applied only in cases of "fraudulent

concealment"). The question before us on appeal is whether the concealment

exception applies in this case,[8] such that the district court correctly ruled that

participants' § 404(a) claims were timely because they were brought within six

---

[8] It is unclear which prong of the exception the district court intended to rely on in finding that the "fraud or concealment" exception applied. Because Plaintiff does not specifically contest that the "fraud" prong of the exception was inapplicable in this case, we analyze only the applicability of the "concealment" prong of the exception.

years of their discovery in 2005.[9]

The crux of Defendants' argument is that because we have referred to § 413's concealment exception as a "[fraudulent] concealment" exception, *Caputo*, 267 F.3d at 190 (brackets in original), the district court was required to find that the elements of common law fraud, including fraudulent intent, were satisfied in order to apply the exception, which it did not expressly do.[10] Defendants' argument rests on a misunderstanding of the meaning of "fraudulent concealment" as used in *Caputo*. In defining "concealment" for the purposes of § 413, we drew in *Caputo* on "the federal concealment rule, also known as the

---

[9] Specifically, the district court ruled that participants did not "discover" their § 404(a) claims until they were informed by counsel in 2005 of the fact of wear-away. We reject Defendants' arguments that wear-away could have been discovered at an earlier date for substantially the same reasons that we reject Defendants' constructive notice arguments as to participants' § 102 claims. We also note that while we do not reach the question of the limitations period applicable to a § 102 claim in this opinion, *see supra* n.5, the applicable limitations period for a § 404(a) claim is set, as discussed above, by statute, *see* 29 U.S.C. § 1113.

[10] In determining whether the prerequisites for the equitable remedy of reformation had been shown, the district court ruled that Foot Locker had committed equitable fraud, which does not require a finding of fraudulent intent. *See Amara II*, 775 F.3d at 526 (noting that equitable fraud "generally consists of 'obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith'"); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193 (1963) ("Fraud has a broader meaning in equity (than at law) and intention to defraud or to misrepresent is not a necessary element." (internal quotation marks omitted)).

25

'fraudulent concealment' doctrine." *Id.* at 188. As we explained, that rule "grew

from the soil of equitable estoppel" and "provides that when a defendant's

wrongdoing 'has been concealed, or is of such character as to conceal itself, the

statute of limitations does not begin to run until the wrongdoing is discovered'

by the plaintiff." *Id.* at 189 (brackets omitted), quoting *Bailey v. Glover*, 88 U.S. (21

Wall.) 342, 349-50 (1874).[11] While the fraudulent concealment doctrine was

initially applied in equitable actions sounding in fraud, federal courts have since

applied the doctrine to federal claims other than fraud at both law and equity.

*Pearl v. City of Long Beach*, 296 F.3d 76, 80 n.3 (2d Cir. 2002). In *Caputo*, we

interpreted § 413's "concealment" exception to incorporate the fraudulent

concealment doctrine, and therefore defined the exception as applying "to cases

in which a fiduciary . . . engaged in acts to hinder the discovery of a breach of

fiduciary duty." 267 F.3d at 190. In so defining the concealment exception, we

noted that the § 413 exception could, accordingly, be described as applying in

---

[11] As we have noted, fraudulent concealment "must not be confused with efforts by a defendant *in a fraud case* to conceal the fraud." *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002) (emphasis in original), quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *see also Brass v. Am. Film Techs.*, 987 F.2d 142, 146, 152 (2d Cir. 1993) (stating that common law fraud claim of fraudulent concealment requires proof of failure to discharge a duty to disclose, intent to defraud or scienter, reliance, and damages).

26

cases of "fraud or [fraudulent] concealment." *Id.* (brackets in original). Thus, properly understood, *Caputo*'s reference to "[fraudulent] concealment" does not impose a requirement that a plaintiff, in order to receive the benefit of § 413's concealment exception, prove the elements of common law fraud. Nor does the fraudulent concealment doctrine contain any such requirement. *See, e.g., State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). We therefore reject Defendants' argument that the district court was required to find fraudulent intent before applying § 413's concealment exception.

With that understanding of the concealment exception, we have little trouble concluding that "concealment" was shown on the factual record before the district court. As we noted in *Caputo*, application of the concealment exception requires that "in addition to alleging a breach of fiduciary duty (be it fraud or any other act or omission), the plaintiff . . . also allege that the defendant committed either: (1) a 'self-concealing act' – an act committed during the course of the breach that has the effect of concealing the breach from the plaintiff; or (2) 'active concealment' – an act distinct from and subsequent to the breach intended to conceal it." 267 F.3d at 189; *see also id.* at 190 n.3. Here, in ruling that Foot Locker breached its fiduciary duties under § 404(a), the district court found not

27

only that the Company failed to disclose wear-away, but also that it made misstatements to participants that suggested that the value of their benefits was fully reflected in their account balances and would increase in value with continued employment. Such "affirmative misrepresentations of a material fact are self-concealing acts" and "hinder[ed] the discovery of [Foot Locker's] breach of fiduciary duty." *Caputo*, 267 F.3d at 190 & n.3. Accordingly, we reject Defendants' challenge to the district court's application of § 413's concealment exception in determining that participants' § 404(a) claims were timely.

## II.    Detrimental Reliance

Defendants argue next that detrimental reliance was a necessary element of participants' § 404(a) claims, and that the district court erred when it awarded class-wide relief on those claims without requiring individualized evidence that participants relied to their detriment on Foot Locker's misstatements and omissions. Defendants' arguments are foreclosed by the Supreme Court's reasoning in *CIGNA Corp. v. Amara* ("*Amara I*"), 563 U.S. 421 (2011).

In *Amara I*, the Supreme Court had occasion, under circumstances similar to those here, to clarify the standard of harm that a plaintiff must show to receive equitable relief pursuant to § 502(a)(3). CIGNA, like Foot Locker, converted its

28

employee pension plan from a defined benefit plan to a cash balance plan, but failed to adequately disclose the possibility of wear-away to plan participants. Following a bench trial, the district court held that CIGNA had violated §§ 102(a), 104(b) and 204(h) of ERISA and ordered that the plan be reformed pursuant to § 502(a)(1)(B) of ERISA, *id.* at 424-25, 431-32, 434, which permits a participant or beneficiary to bring a civil action to, *inter alia*, "recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

On writ of certiorari, the Supreme Court vacated the district court's judgment, concluding that the remedy of plan reformation was not available under § 502(a)(1)(B) because the relevant statutory text "speaks of '*enforc[ing]*' the 'terms of the plan,' not of '*changing*' them." *Amara I*, 563 U.S. at 436 (emphasis in original), quoting 29 U.S.C. § 1132(a)(1)(B). The Court stated, however, that the district court could have instead granted such relief under § 502(a)(3) of ERISA, which allows a participant "to obtain other appropriate equitable relief" to redress ERISA violations. *Amara I*, 563 U.S. at 438 (emphasis omitted), quoting 29 U.S.C. § 1132(a)(3). In so stating, the Supreme Court rejected the argument that a showing of detrimental reliance was always required for relief under § 502(a)(3).

29

Specifically, the Court reasoned as follows:

> The relevant substantive provisions of ERISA [*i.e.*, §§ 102(a), 104(b) and 204(h)] do not set forth any particular standard for determining harm. . . . Hence, any requirement of harm must come from the law of equity. Looking to the law of equity, there is no general principle that "detrimental reliance" must be proved before a remedy is decreed. To the extent any such requirement arises, it is because the specific remedy being contemplated imposes such a requirement.

*Amara I*, 563 U.S. at 443.

Application of *Amara I*'s reasoning mandates the conclusion that detrimental reliance need not be shown where, as here, a plaintiff alleging a violation of § 404(a) seeks plan reformation under § 502(a)(3). In determining the applicable standard of harm, *Amara I* asks: (1) whether the substantive ERISA provision in question sets forth a standard for determining harm; and (2) whether the specific remedy being contemplated imposes such a requirement. *See id.*; *see also Frommert v. Conkright*, 738 F.3d 522, 534 (2d Cir. 2013) (applying *Amara I* framework); *Amara II*, 775 F.3d at 525 n.12 (same). Because the statutory text of § 404(a) does not articulate any standard for determining harm, *see* 29 U.S.C. § 1104(a), any requirement of detrimental reliance in this case must arise because of the "specific remedy being contemplated." *Amara I*, 563 U.S. at 443. Here, that

remedy is plan reformation, which *Amara I* itself stated does not require a

showing of detrimental reliance. *Id.* Specifically, looking to the practice of courts

at equity, *Amara I* stated that while the imposition of a remedy equivalent to

estoppel under § 502(a)(3) requires a showing of detrimental reliance, such a

showing "is not always necessary for other equitable remedies." *Id.* In the case of

reformation, *Amara I* deemed a showing of detrimental reliance unnecessary

because equity courts required only that fraudulent statements or omissions

"materially . . . affected the substance of the contract," and that the mistaken

party not be so grossly negligent such that its conduct "f[e]ll below a standard of

reasonable prudence" in ordering such relief. *Id.* (brackets, citations and internal

quotation marks omitted); *see also Amara II*, 775 F.3d at 525 n.12 (further

elaborating the standard of harm required for the equitable remedy of

reformation under § 502(a)(3)).

Accordingly, because neither the statutory text of § 404(a) nor the equitable

remedy of reformation requires a showing of detrimental reliance,[12] we hold that

---

[12] Defendants cite our decision in *Bell v. Pfizer, Inc.*, 626 F.3d 66 (2d Cir. 2010) for the proposition that "where a plaintiff asserts a breach of fiduciary claim based on a material misrepresentation or omission, the plaintiff must establish detrimental reliance," *id.* at 75, regardless of the equitable remedy sought. But *Bell* pre-dates the Supreme Court's decision in *Amara I. See Frommert*, 738 F.3d at 534 (reconsidering

the district court correctly declined to require such a showing in this case before granting class-wide relief on participants' § 404(a) claims.

## III.   Mistake

Defendants also contend that the district court erred in concluding that mistake, a prerequisite to the equitable remedy of contract reformation, was proven by clear and convincing evidence. A contract may be reformed in the ERISA context where, *inter alia*, one party is mistaken and the other commits fraud or engages in inequitable conduct. *Amara II*, 775 F.3d at 525. Because Defendants do not challenge the district court's ruling that Foot Locker committed equitable fraud and engaged in inequitable conduct, the only question before us is whether the district court erred in concluding that participants suffered from a mistaken understanding of Foot Locker's employee pension plan.

As we stated in *Amara II*, to prove mistake for the purposes of the remedy of reformation under § 502(a)(3), a plaintiff must show by clear and convincing evidence that "a party entered a contract 'in ignorance or mistake of facts

applicable standard of harm for ERISA notice violations in light of *Amara*). Moreover, the portion of *Bell* cited by Defendants is dictum since the panel ultimately affirmed the district court's dismissal of the fiduciary duty claim on the independent ground that ERISA liability does not extend to "unintentional misstatements regarding collateral, non-ERISA plan consequences of a retirement decision." 626 F.3d at 77.

material to its operation.'" *Id.* at 529, quoting *Ivinson v. Hutton*, 98 U.S. 79, 82 (1878). That evidence need not be individualized. A plaintiff "can prove ignorance of a contract's terms through generalized circumstantial evidence in appropriate cases," and such proof "may be more than sufficient, moreover, in certain cases where . . . defendants have made uniform misrepresentations about an agreement's contents and have undertaken efforts to conceal its effect." *Amara II*, 775 F.3d at 529. That is precisely the case here, where the district court found that class-wide communications uniformly failed to describe wear-away and, in fact, concealed the phenomenon by giving participants the false impression that their benefits would be fully reflected in growing account balances. The district court also based its ruling on the testimony of class members who did not understand that their accounts were suffering from wear-away,[13] and the fact that

---

[13] In challenging the district court's finding of class-wide mistake, Defendants note the testimony of a senior human resources manager, Linda Ine, who testified at trial that while she did not understand at the time of conversion that her pension would suffer from wear-away, she eventually, prior to leaving the Company in 1999, realized after performing her own calculations that she had not accrued additional benefits since the plan conversion. That testimony contradicted Ine's account during a 2012 deposition, in which she testified that she had not realized until informed at the deposition that her account had been in wear-away. The district court did not specifically address the testimony in its findings of fact or make any credibility determination as to Ine. In light of the substantial evidence relied upon by the district court in finding class-wide mistake, however, the fact of Ine's internally inconsistent testimony is not sufficient on its own to establish clear error.

not a single plan participant ever complained about wear-away, from which the district court drew the reasonable inference that participants were ignorant of the phenomenon. *See Amara II*, 775 F.3d at 530 ("We can discern no error, moreover, in the district court's inference that informed employees, aware that their pension benefits were less valuable, would have protested the change . . . .").

Defendants do not challenge the district court's reliance on that evidence, arguing instead that individualized communications received by plan participants who had inquired about various aspects of their benefits dispelled any mistake for those participants. The district court rejected that interpretation of the factual record, and we discern no clear error in the district court's finding. While the individualized communications in question provided an explanation of some of the calculations used to determine participants' benefits, they did not disclose the existence of wear-away or the fact that participants' benefits were not increasing despite the accumulation of pay and interest credits.

In sum, having considered Foot Locker's arguments and reviewed the record as a whole, we conclude that the district court did not err, much less clearly err, in concluding that class-wide mistake was demonstrated by clear and convincing evidence.

## IV.    The District Court's Remedy

Finally, Defendants argue that the district court's award of equitable relief should have been tailored to account for the fact that certain participants experienced little to no wear-away. Defendants focus, in particular, on participants who received seniority enhancements under the cash balance plan. Those participants, Defendants contend, experienced little to no wear-away, but in fact received *more* relief than other participants because they benefitted from a windfall created by the cumulative effect of the "A benefit" and "B benefit" ordered by the district court.

As explained above, the A benefit converts a participant's benefits under the old plan into an initial account balance under the new plan, using a six-percent discount rate and no mortality discount. That formula remedies wear-away because – unlike the original conversion formula, which applied a nine-percent discount rate and mortality discount – the district court's formula yields an initial account balance equivalent to a participant's benefits under the old plan. With that adjusted initial account balance, the pay and interest credits awarded as part of the B benefit are no longer rendered worthless by wear-away, but result in actual increases to the value of a participant's benefits.

That much of the relief Defendants do not seriously challenge.[14] They do argue, however, that the district court erred when, in fashioning the B benefit, it failed to account for the fact that participants who received seniority enhancements under the cash balance plan experienced less wear-away and had already, in Defendants' view, been made whole by receipt of the A benefit. Under the plan as originally designed, Defendants contend, the seniority enhancement closed the initial gap between a participant's account balance and the value of the participant's old plan benefits, thus reducing the amount of time

---

[14] Defendants suggest that the district court's formula for converting a participant's accrued benefits under the old plan to his or her initial account balance violates 29 U.S.C. § 1055(g)(3)(A), but that ERISA provision is inapplicable here for at least two reasons. First, it establishes requirements that pension plans must follow when they distribute the present value of certain types of annuities; the provision does not purport to constrict a district court's authority to order equitable relief under § 502(a)(3) of ERISA. *See Esden v. Bank of Boston*, 229 F.3d 154, 164-65 & n.13 (2d Cir. 2000); *see also generally Bd. Tr. Equity League Pension Tr. Fd. v. Royce*, 238 F.3d 177 (2d Cir. 2001) (discussing the rights conferred by § 1055 upon surviving spouses). Second, even assuming *arguendo* that § 1055(g)(3)(A) would bear on the appropriateness of the district court's conversion formula, the provision sets only a floor for the calculation of the lump sum value of an annuity; it would not bar a plan from using a formula that resulted in a higher lump sum value, which was the effect of the district court's formula here. *See Esden*, 229 F.3d at 165 ("These 'present value requirements' require that any lump sum distribution be *at least* the present value of the normal retirement benefit." (emphasis added)).

36

that the account would otherwise have spent in wear-away.[15] Defendants argue that those participants should thus have received proportionately less relief from the district court, but in fact received *more* – that is, those participants received not only the A benefit that all participants received, but also a seniority enhancement as part of the B benefit.

Defendants' arguments are not completely without theoretical appeal, but we review a district court's award of equitable relief "only for an abuse of discretion or for a clear error of law," *Amara II*, 775 F.3d at 519 (internal quotation

---

[15] Defendants also contend that some participants did not suffer any wear-away because the size of their seniority enhancements put their initial account balances in excess of the value of the benefits they accrued under the defined benefit plan. That argument is made only in the course of Defendants' challenge to the district court's purported failure to tailor its relief to account for the lessened wear-away experienced by some participants. Defendants do not argue that those participants did not suffer any injury and should therefore be excluded from class relief – an argument that we have previously rejected under similar factual circumstances. *See Amara II*, 775 F.3d at 527 (concluding that district court did not err in determining that employer committed fraud or inequitable conduct against participants who arguably did not suffer from wear-away because "[b]y hiding the truth about the plan, CIGNA prevented *all* of its employees from becoming disaffected, spreading knowledge regarding the plan to others who stood to lose more from the benefit conversion, and from planning for their retirement" (emphasis in original)). In any event, we note that the district court found, and Defendants do not challenge on appeal, that all participants suffered from wear-away as measured on an "annuity" basis (measured by comparing a participant's account balance and the benefits earned under the old plan on an annuity-to-annuity basis), even if approximately 1.4 percent of participants did not experience wear-away as measured on a lump sum basis.

marks omitted), and we detect none here. As we stated in *Amara II*, the equitable remedy of reformation is governed by contract principles, and a district court may "properly reform[] [a pension] plan to reflect the representations that the defendants made to the plaintiffs." *Id.* at 525. Here, the district court awarded the seniority enhancement as part of the B benefit because the SPD expressly promised to eligible participants that they would receive the enhancement as part of their benefit under the cash balance plan. Accordingly, we conclude that the district court's award of an "A benefit" and "B benefit" to all participants did not fall outside the "range of permissible decisions" available under an abuse of discretion standard. *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008).[16]

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[16] Defendants identify a number of differences between the relief ordered here and that approved in *Amara II* – including, for example, that the district court in *Amara* chose to award the value of participants' benefits under the defined benefit plan in annuity form, rather than converting that annuity, as here, to an actuarially equivalent lump sum value that would form the basis for a participant's initial account balance under the cash balance plan. *Compare Amara II*, 775 F.3d at 518-19, *with Osberg*, 138 F. Supp. 3d at 560-61. But the mere fact that the relief ordered by the district court here may differ in some respects from the relief approved in *Amara II* does not mandate a ruling that the district court abused its discretion. Our ruling in *Amara II* did not set a required template for the award of equitable relief in ERISA cases concerning wear-away; it simply found that the district court's chosen remedy fell within its considerable discretion in fashioning equitable relief. *See Amara II*, 775 F.3d at 531-32.