Pessin v. JPMorgan Chase

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2023
No. 23-25

JOSEPH PESSIN, on behalf of himself and all others similarly situated,
*Plaintiff-Appellant,*

*v.*

JPMORGAN CHASE U.S. BENEFITS EXECUTIVE, as Plan Administrator of
the JPMorgan Chase Retirement Plan, BOARD OF DIRECTORS OF
JPMORGAN CHASE BANK AND J.P. MORGAN CHASE & COMPANY,
JPMORGAN CHASE RETIREMENT PLAN,
*Defendants-Appellees.*

---

On Appeal from a Judgment of the United States District Court for
the Southern District of New York.

---

ARGUED: SEPTEMBER 28, 2023
DECIDED: AUGUST 13, 2024

Before: PARKER, NARDINI, *Circuit Judges*, and RAKOFF, *District Judge*.[*]

---

[*] Judge Jed S. Rakoff, United States District Judge for the Southern District
of New York, sitting by designation.

Plaintiff-Appellant Joseph Pessin brought suit on behalf of himself and all others similarly situated against JPMorgan Chase & Company ("JPMC"), the JPMorgan Chase Retirement Plan and its appointed fiduciaries, asserting various claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Pessin contends that the Defendants made insufficient disclosures to pension plan participants following the retirement plan's conversion from a traditional defined benefit plan to a cash balance plan. The United States District Court for the Southern District of New York (Denise L. Cote, *District Judge*) granted the Defendants' motion to dismiss Pessin's amended complaint in its entirety for failure to state a claim, concluding that the Defendants provided adequate disclosures that explained how the retirement plan worked and did not mislead plan participants about the potential effect of the conversion on a plan participant's accrued benefits. We agree that the Defendants sufficiently disclosed an aspect of the cash balance plan known as "wear-away," and that the summary plan descriptions clearly and accurately explained how a plan participant's benefits would be calculated. But we disagree with the district court's determination that the Defendants complied with ERISA § 105(a) by providing annual pension benefit statements that properly indicated a plan participant's total benefits accrued. We therefore also conclude that Pessin adequately alleged that the Board of Directors of JPMC breached its fiduciary duty through its failure to monitor the performance of the JPMC Benefits Executive with respect to the benefit statements, and that the district court therefore erred in dismissing Pessin's ERISA § 404(a) claim against the Board to that extent. Accordingly, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.

TERESA S. RENAKER (David S. Preminger, Jeffrey G. Lewis, and Chris N. Ryder, Keller Rohrback LLP, New York, NY, Oakland, CA, and Seattle, WA, *on the brief*), Renaker Scott LLP, San Francisco, CA, *for Plaintiff-Appellant*.

JEREMY P. BLUMENFELD (Sari M. Alamuddin, Eric L. Mackie, Stephanie R. Reiss, and Michael E. Kenneally, *on the brief*), Morgan, Lewis & Bockius LLP, Philadelphia, PA, Chicago, IL, Pittsburgh, PA, and Washington, DC, *for Defendants-Appellees*.

---

WILLIAM J. NARDINI, *Circuit Judge*:

Plaintiff-Appellant Joseph Pessin, on behalf of himself and all others similarly situated, appeals from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, *District Judge*), entered in favor of the Defendants-Appellees JPMorgan Chase & Company ("JPMC"), JPMorgan Chase U.S. Benefits Executive ("JPMC Benefits Executive"), the Board of Directors of JPMC ("JPMC Board"), and the JPMorgan Chase Retirement Plan ("JPMC Plan") (together, "Defendants"). In his

3

amended complaint ("Amended Complaint"), Pessin asserted claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, arising out of the Defendants' allegedly inadequate disclosures following JPMC's decision to convert its employee retirement plan from a traditional defined benefit plan into a cash balance plan. The district court dismissed the suit under Federal Rule of Civil Procedure 12(b)(6), concluding that the Amended Complaint failed to allege facts supporting a plausible inference that the JPMC Benefits Executive and JPMC Board violated their fiduciary duties under ERISA. *See generally Pessin v. JPMorgan Chase U.S. Benefits Exec.*, No. 22-cv-2436 (DLC), 2022 WL 17551993 (S.D.N.Y. Dec. 9, 2022).

As explained below, we conclude that the Defendants complied with ERISA § 404(a) by sufficiently disclosing an aspect of the plans known as "wear-away," and that they complied with ERISA § 102 because the relevant summary plan descriptions ("SPDs") clearly and

4

accurately explained how a plan participant's benefits would be calculated. We disagree, however, with the district court's determination that the Defendants complied with ERISA § 105(a), which requires much more specifically that a plan provide annual pension benefit statements ("Benefit Statements") that unambiguously indicate a plan participant's "total benefits accrued." The Defendants here sent statements to Pessin and the putative class members that included only one of two alternative calculations of their benefits, and the calculation they provided to Pessin did not reflect the amount he was actually entitled to receive. We also conclude that Pessin adequately alleged that the JPMC Board breached its fiduciary duty through its failure to monitor the performance of the JPMC Benefits Executive with respect to the Benefit Statements. The district court therefore erred in dismissing Pessin's ERISA § 404(a) claim against the JPMC Board in that narrow regard. Accordingly, we AFFIRM IN PART, REVERSE IN PART, and

5

REMAND for further proceedings consistent with this opinion.

## I. Background

The following facts are drawn from the well-pleaded allegations in Pessin's Amended Complaint, which we must accept as true for purposes of evaluating the Defendants' motion to dismiss. *Harvey v. Permanent Mission of the Republic of Sierra Leone to the United Nations*, 97 F.4th 70, 74 (2d Cir. 2024).

### A. The Pension Plans and Related Disclosures

#### 1. The Pension Plans

Pessin began working for J.P. Morgan & Co. ("Morgan") in 1987 and participated in the Retirement Plan for Employees of Morgan Guaranty Trust Company of New York and Affiliated Companies for United States Employees ("Morgan Plan"). The Morgan Plan was a traditional defined benefit pension plan that provided a benefit, beginning at retirement, in the form of a lifetime annuity or lump sum payment. The benefit was calculated using a final average pay benefit

formula and based on certain factors, including a participant's retirement age, compensation, and years of service.[1] The Morgan Plan also provided an early retirement benefit for certain participants who elected to commence benefits between the ages of fifty-five and sixty.

On December 31, 1998, the Morgan Plan transitioned to using a cash balance formula and was renamed the Cash Balance Plan of Morgan Guaranty Trust Company of New York and Affiliated Companies for United States Employees ("Cash Balance Plan"). The Cash Balance Plan remained a defined benefit plan but began displaying participants' benefits as hypothetical "account balance[s]." J. App'x at 14, ¶ 18. These account balances periodically earned "pay

---

[1] The Morgan Plan utilized a normal retirement age of 65 and provided "a retirement benefit for the life of the member alone in an annual amount equal to the product of (x) and (y), plus, if applicable, (z) where (x) is the sum of (i) 1.6% of the computed average salary of the member not in excess of his covered compensation plus (ii) 1.9% of such salary in excess of his covered compensation, and (y) is his years of credited service up to 30 years and (z) is, for a member in service on December 31, 1986, .5% of his computed average salary for each year of credited service in excess of 30 but not more than 40." J. App'x at 13, ¶ 14.

credit[s]," based on a participant's compensation, along with "interest credits," derived from annual interest rates. *Id.* As part of the transition to the Cash Balance Plan, participants who had accrued benefits under the old Morgan Plan were assigned a hypothetical opening account balance as of December 31, 1998.[2] Further, under the Cash Balance Plan, former Morgan Plan participants' benefits would continue to accrue under both the final average pay formula and the cash balance formula until December 30, 2003. Thereafter, pension plan participants accrued benefits only under the cash balance formula.

ERISA's "anti-cutback" rule provides, in relevant part, that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . ." 29 U.S.C. § 1054(g)(1). To ensure compliance with this rule, the Cash Balance Plan provided

---

[2] Former Morgan Plan participants' accrued benefits were converted into account balances using certain actuarial assumptions, including a six percent interest rate and a mortality assumption.

8

that "a participant's accrued benefit shall not be less than the participant's accrued benefit as of December 30, 2003." J. App'x at 15, ¶ 24. In other words, at retirement, former Morgan Plan participants would be entitled to the greater of either (1) their accrued benefits under the original traditional defined benefit plan, which was calculated using the final average pay formula, or (2) their accrued benefits under the Cash Balance Plan's recently adopted cash balance formula. Under this "greater of" comparison, the final average pay benefit as of December 30, 2003, became the minimum benefit former Morgan Plan participants would receive regardless of when they left employment and began receiving benefits.

Due to this benefit comparison, under the Cash Balance Plan, former Morgan Plan participants accrued no new benefits until their cash balance caught up to and surpassed their December 31, 2003, accrued benefit under the final average pay formula. This concept is

known as "wear-away."[3] During the wear-away period, former Morgan Plan participants' actual benefits were effectively frozen, despite their continued employment, until they accrued enough pay and interest credits to exceed their previously accrued benefits under the traditional defined benefit plan.

On December 31, 2000, Morgan merged into Chase Manhattan Bank, creating JPMC. The Cash Balance Plan also merged into the Retirement Plan of The Chase Manhattan Bank and Certain Affiliated Companies, creating the JPMC Plan. The JPMC Plan continued the wear-away effect of the Cash Balance Plan, because former Morgan Plan participants still accrued no additional benefits until their cash balance benefits exceeded, if ever, their accrued benefits under the final average pay formula.

---

[3] This Court has previously explained that within the benefits industry, "wear-away" describes the period when "any pay and interest credits earned by a participant would not increase his or her actual benefits, but merely reduce the gap between the value of the participant's cash balance account and the participant's old benefits." *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 203 (2d Cir. 2017).

10

## 2.  The Summary Plan Descriptions

After the conversion to a cash balance formula, Morgan and then JPMC (following the merger) issued several summary plan descriptions to plan participants.  The Amended Complaint focuses on three of those SPDs.

First, in January 1999, Morgan issued an SPD ("1999 SPD") that described how a plan participant's benefit is determined and received.  The 1999 SPD also explained Morgan's transition to the Cash Balance Plan and how benefits would be calculated during the transition:

> [B]enefits will be calculated using two formulas – the prior formula and the Cash Balance Formula – during the five-year period from January 1, 1999 through December 31, 2003.  If you leave Morgan during this period and are vested, you will receive the larger of the two benefits.  After December 31, 2003, your accrued benefit under the prior formula will be frozen and will continue to act as a minimum benefit.  When you leave Morgan, you will receive the larger of the minimum benefit or your balance under the Cash Balance Plan.
>
> If you leave Morgan after December 31, 2003, your

11

> additional years of age and service will count toward your eligibility for early retirement benefits under the prior formula. However, the amount of your benefit will be calculated using your service and final average earnings through December 31, 2003.

J. App'x at 51.

Second, the following year, Morgan issued an SPD, effective September 18, 2000 ("2000 SPD"), that made substantially similar disclosures as the 1999 SPD regarding the operation of the Cash Balance Plan and the minimum benefit former Morgan Plan participants might receive.

Third, in 2005, after the Cash Balance Plan became the JPMC Plan, JPMC issued an SPD ("2005 SPD"). In a section titled "Important Terms," the 2005 SPD defined "minimum benefit":

> In general, when a pension plan changes as a result of a plan merger or modification, participants cannot receive less than any amounts they had accrued or earned under that plan prior to the date of the merger or modification. This amount is referred to as the "minimum benefit." When you request a distribution, that minimum benefit will be compared to your accrued benefit under the Retirement Plan and you will receive the greater of the

two amounts. If you participated in the retirement plan of a heritage organization, please see the appropriate Appendix in this summary plan description for more information on minimum benefits.

*Id.* at 119. For plan participants who participated in the Cash Balance Plan as of December 31, 2001, the 2005 SPD directed them to review "Appendix C."

Appendix C confirmed that former Morgan Plan participants would have "a minimum benefit which is determined under a prior plan benefit formula." *Id.* at 156. It specified that the "minimum benefit [is] equal to your accrued benefit under the final average pay formula as of the earlier of your termination of employment or December 31, 2003." *Id.* at 158. Appendix C further explained to JMPC Plan participants that "[e]ach of these minimum benefits will be compared to your cash balance benefit under the [JPMC Plan] at the time you elect to receive payment. If one of the minimum benefits exceeds your cash balance benefit, you will receive that minimum benefit." *Id.* at 159. It cautioned that "the amount shown on your

account statement . . . reflects only the benefit earned under the cash balance formula and does not take into account this minimum benefit." *Id.* Thus, Appendix C advised plan participants who wanted to compare their benefits to contact Human Resources because "[benefit] projections prepared through *access*HR will reflect the greater of your cash balance formula or your benefit provided under the final average pay formula." *Id*.

### 3. The Benefit Statements

Beginning in 2002, the JPMC Benefits Executive—the JPMC Plan administrator—provided Benefit Statements to all participants in the JPMC Plan. As noted in the SPDs, the Benefit Statements displayed only a plan participant's benefit earned under the cash balance formula. For example, using the cash balance formula, Pessin's 2019 Benefit Statement showed his opening account balance as of January 1, 2019, and his closing account balance as of December 31, 2019. According to the 2019 Benefit Statement, Pessin's cash

14

account balance purportedly increased that year from pay credits and interest credits. However, directly below the cash balance amounts, the statement notes: "This statement does not reflect any minimum benefit that you might have accrued under a prior plan formula. If you would like more information about minimum benefits, you can call HR Answers." *Id.* at 173. The Benefit Statement provided the contact information for HR Answers on the following page.

## B. Pessin's Investigation Into His Accrued Benefits

In 2019, Pessin left his employment with JPMC. Not long after, on March 27, 2019, Pessin received a pension benefit election packet. In April 2021, Pessin requested a new pension election packet, as well as additional information about how his pension benefit was calculated. JPMC provided Pessin with the requested calculation worksheets, which showed that Pessin was entitled to receive the "minimum benefit" because his accrued benefits under the final average pay formula as of December 31, 2003, were still higher than

15

the current amount in his cash balance account.

### C. Procedural History

On March 25, 2022, after receiving his benefit calculations, Pessin brought suit against the Defendants on behalf of himself and a proposed class of similarly situated plan participants and beneficiaries, claiming that the Defendants violated their fiduciary duties and statutory obligations under ERISA, 29 U.S.C. § 1001 *et seq*. Pessin amended his complaint on July 27, 2022. Specifically, Pessin claimed that (1) the JPMC Benefits Executive breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), by "failing to disclose that the[ class's] pension benefits were frozen and intentionally concealing the fact that they were not accruing additional pension benefits through their continued employment," J. App'x at 27, ¶ 81; (2) the JPMC Board breached its fiduciary duties under § 404(a) by failing to monitor the performance of the JPMC Benefits Executive; (3) the JPMC Benefits Executive violated ERISA

16

§ 105(a), 29 U.S.C. § 1025(a), by failing to provide pension benefit statements that meet the standards of that section; and (4) the JPMC Benefits Executive violated ERISA § 102, 29 U.S.C. § 1022, by failing to provide SPDs that meet the standards of that section and the regulations promulgated under that section. The Defendants moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, among other things, that they made proper disclosures in the SPDs and Benefit Statements following the JPMC Plan's conversion from a final average pay formula to a cash balance formula.

On December 9, 2022, the district court granted the Defendants' motion to dismiss as to all claims, reasoning that the Defendants had, in fact, provided sufficient disclosures that explained both the transition to the cash balance formula and how plan participants could compare their benefits under the cash balance formula and final average pay formula during the wear-away period. *Pessin*, 2022 WL

17551993, at *7–8.  The district court also concluded that the JPMC

Benefits Executive and JPMC Board did not breach the Defendants'

fiduciary duties under ERISA.  *Id*. at *5–7.  Pessin appealed.

## II.  Discussion

On appeal, Pessin principally argues that the district court

erred in concluding that the Defendants made adequate disclosures

about the JPMC Plan's conversion from a traditional defined benefit

plan to a cash balance benefit plan and its impact on his accrued

benefits.

"We review *de novo* the district court's dismissal of the

Amended Complaint for failure to state a claim under Rule 12(b)(6)."

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th

381, 390 (2d Cir. 2024).  In reviewing a motion to dismiss, "[w]e accept

the Amended Complaint's well-pleaded factual allegations as true

and construe them in the Plaintiff['s] favor."  *Id*.  We may also

consider "documents attached to the complaint as exhibits, and

documents incorporated by reference in the complaint." *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 436 (2d Cir. 2024) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

## A. Section 404(a) Claim Against the JPMC Benefits Executive

Pessin challenges the district court's dismissal of his claim that the JPMC Benefits Executive breached its fiduciary duties under ERISA § 404(a). He argues that the SPDs and Benefit Statements did not sufficiently disclose the consequences of wear-away and misled plan participants into "believing that they were earning additional benefits when they were not." Appellant's Br. at 18.

ERISA § 404(a) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). ERISA's fiduciary duties of loyalty and prudence are "the highest duties known to law." *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 208 (2d Cir. 2016) (citation, emphasis, and quotation marks omitted). "When a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001) (citation and quotation marks omitted). Thus, a plan administrator's failure to sufficiently explain the consequences of wear-away can qualify as a breach of fiduciary duty. *See, e.g.*, *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 555 (S.D.N.Y. 2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017).

We agree with the district court that here, the JPMC Benefits Executive provided disclosures sufficient to comply with its fiduciary

20

duties. While the term "wear-away" was not explicitly used in the relevant disclosures, the 1999 and 2000 SPDs explained the plan's transition to a cash balance formula and its potential consequences on plan participants. They disclosed that plan participants as of December 31, 1998, would continue to accrue benefits under the final average pay formula through December 31, 2003. The disclosures also noted that, "[a]fter December 31, 2003, [their] accrued benefit under the prior formula [would] be frozen and [would] continue to act as a minimum benefit." J. App'x at 51.

The Amended Complaint defines wear-away as the possibility that "the [frozen] benefit [the participant] had accrued through December 30, 2003, [would] exceed[] the benefit that he accrued over the subsequent years . . . ." *Id.* at 10. The 1999 and 2000 SPDs disclosed this possibility, stating that when plan participants terminated their employment with Morgan, their frozen benefit would continue to act as a minimum benefit that they would receive

21

if it exceeded the cash balance benefit. Thus, Pessin fails to show how these class-wide communications do not adequately describe the potential implications of wear-away.

In addition, the 1999 and 2000 SPDs underscored that the final average pay benefit would "includ[e] any early retirement subsidies." *Id.* at 51, 88. Due to his age and substantial years of service, Pessin learned that he was eligible for early retirement subsidies, and he therefore received certain additional benefits because of his continued employment with JPMC. As a result, following the 1999 and 2000 SPDs, Pessin should have been aware that his final average pay benefit might exceed his cash balance benefit. Accordingly, we agree with the district court that both the 1999 and 2000 SPDs sufficiently disclosed to plan participants the consequences of wear-away on Pessin's accrued benefits.

The 2005 SPD provides further information on the effect of wear-away and its impact on a plan participant's benefits. Published

22

after the merger that formed JPMC, the 2005 SPD advised those who had "participated in the retirement plan of a heritage organization" to consult the appropriate appendix. *Id.* at 119. For Pessin, this was Appendix C. Similar to the 1999 and 2000 SPDs, Appendix C explained that Pessin would have a minimum benefit determined under the final average pay formula. Appendix C then clarified that "[i]f . . . the minimum benefit[] exceeds your cash balance benefit, you will receive that minimum benefit." *Id.* at 159. As the district court correctly acknowledged, this is exactly what happened here. *See Pessin*, 2022 WL 17551993, at *6 ("[Pessin's] cash balance benefit was lower than his minimum benefit under the prior formula, so, as previously explained to plaintiff in the SPDs, he was entitled to the minimum benefit when he requested benefits election packets in 2019 and 2021.").[4]

---

[4] There are a couple of reasons why Pessin's minimum benefit would be greater than his cash balance benefit. As previously explained, Pessin's age and service qualified him for early retirement benefits, and, as a result, it was possible

23

Pessin argues that the appendices in the 2005 SPD are confusing for several reasons, none of which are persuasive. First, he argues that it is not clear that Appendix C applied to him because the "appendices did not apply after December 31, 2004." Appellant's Br. at 29. However, the 2005 SPD was issued in Fall 2005 and the "Important Terms" section at the beginning of the document clearly directs all plan participants to review the relevant appendices. Second, Pessin contends that both Appendix A and Appendix C applied to him. The 2005 SPD explained that Appendix A is for plan participants who were part of the JPMC Plan between 2002 and 2004. While this period might capture certain plan participants (including Pessin) who were hired by Morgan and Chase, Appendix A directs plan participants to consult different appendices depending on their

---

that his final average pay benefit (which included the early retirement benefits) would exceed his cash balance benefit at distribution. Additionally, the 2005 SPD describes how interest rates could also affect the value of a plan participant's cash balance benefit at the time it is calculated. If interest rates were low at the time Pessin received his election packet, his cash benefit could have been significantly lower than his final average pay benefit.

individual circumstances. In that regard, the 2005 SPD noted that Appendix C is applicable to those plan participants, like Pessin, who became part of the Cash Balance Plan as of the end of 2001. Third, Pessin argues that Appendix C does not illustrate how his cash balance benefit is calculated. But these details are explained in the main body of the 2005 SPD, just as they were also described in the 1999 and 2000 SPDs.

Lastly, Pessin argues that the 2005 SPD does not properly address two potential reasons for why his final average pay benefit might have exceeded the cash balance benefit: (1) that his cash balance plan had an inappropriately low opening balance at the start of 1999, or (2) that there were comparatively high additional accruals in the final average pay formula during the five-year period between 1999 and 2003. Pessin, however, does not allege in the Amended Complaint that either of these possibilities actually occurred. The 2005 SPD explained that interest rates and early retirement benefits

25

are two potential explanations for why a plan participant's final average pay benefit might be greater than their cash balance benefit. This was sufficient to put someone in Pessin's position on notice that they might receive the minimum benefit rather than the cash balance benefit.

Furthermore, all three SPDs gave plan participants specific instructions, if needed, to learn more about their benefits. The 1999 and 2000 SPDs, for instance, state on the first page, "[f]or questions about your cash balance plan benefits, call Morgan Direct" at the phone number provided. J. App'x at 38, 74. The 2005 SPD advised plan participants to direct questions to "*access*HR" at the phone number provided. *Id.* at 114. The 2005 SPD also explained that "projections prepared through *access*HR" were available and would "reflect the greater of your cash balance formula or your benefit provided under the final average pay formula." *Id.* at 159. Similarly, while the 2019 and 2020 Benefit Statements included only each plan

26

participant's cash balance amounts, the Benefit Statements expressly stated that they did not "reflect any minimum benefit that you might have accrued under a prior plan formula" and that plan participants who wanted "more information about minimum benefits . . . can call HR Answers." *Id.* at 173, 178. The Benefit Statements included the same toll-free number that the 2005 SPD had given. Thus, Pessin had several opportunities to learn more about his specific benefit package and receive additional information. The JPMC Benefits Executive therefore met its fiduciary duties by providing accurate disclosures about Pessin's pension benefits. The Benefit Statements and SPDs told plan participants how to access more information about their minimum benefits and to what extent wear-away might impact their pension benefits at disbursement.

Pessin draws our attention to two recent decisions of district courts in this Circuit to support his contention that Defendants' disclosures are insufficient, but neither case is apposite. First, he relies

27

on *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 523 (S.D.N.Y. 2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017). In that case, following the conversion from a defined benefit plan to a cash balance plan, pension plan participants brought suit against the plan's fiduciaries under ERISA. 138 F. Supp. 3d at 523. The Plaintiffs argued, among other things, that the defendants failed to articulate changes to the retirement plan in the SPDs and that the plan participants were led to believe that they would receive their frozen traditional benefit plus their cash balance accounts. *Id.* The district court determined that the plan participants' understanding was reasonable because inaccurate information was provided in the SPDs including, specifically, that the disclosure conflated the plan participants' cash balance accounts with their final accrued benefits. *See id.* at 532. Here, however, the SPDs and Benefit Statements accurately outlined the difference between a plan participant's cash balance account and their final accrued benefit upon termination of employment, and advised plan participants on

how to access more information about their minimum benefits and obtain a benefit comparison. Plan participants in *Osberg*, in contrast, were not told how to obtain the necessary information to compare their accrued benefits under their prior plan to their cash balance accounts. *See id*. at 532-33.

Likewise, in *Amara v. CIGNA Corp.*, the plan participants alleged that their employer prevented them from learning the amount of their traditional defined benefits. 534 F. Supp. 2d 288, 346-48 (D. Conn. 2008), *aff'd*, 348 F. App'x 627 (2d Cir. 2009), *vacated and remanded on other grounds*, 563 U.S. 421 (2011), *on remand,* 925 F. Supp. 2d 242 (D. Conn. 2012), *aff'd*, 775 F.3d 510 (2d Cir. 2014). The district court found that the defendants directed their benefits department "not to provide benefits comparisons under the old and new plans . . . even though employees explicitly requested such a comparison." *Amara*, 775 F.3d at 530–31 (cleaned up); *see Amara*, 534 F. Supp. 2d at 343. Pessin does not make similar allegations here. The SPDs and Benefit

Statements, in this case, explained in detail how plan participants could learn more information about their frozen final average pay benefit and advised that plan participants should call certain direct access "help lines" for more information about their benefit comparisons. Additionally, Pessin does not dispute that when he requested additional information regarding his benefit calculations, he received calculation worksheets that accurately displayed his minimum benefits along with the cash account balance. There is no evidence that the Defendants withheld any information about his benefits.

### B. Section 102 Claim

Next, Pessin argues that the JPMC Benefits Executive violated ERISA § 102, 29 U.S.C. § 1022, by failing to provide SPDs that sufficiently disclosed wear-away to plan participants and by allegedly misleading participants into believing that their accrued benefits were growing instead of frozen during the wear-away

period.  Section 102 "requires covered employee benefit plans to furnish summary plan descriptions . . . of a plan's terms to participants."  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 177 (2d Cir. 2021).  The SPDs need to be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  *Id.* (quoting 29 U.S.C. § 1022(a)).  For example, the disclosures must describe circumstances that might result in the loss of benefits, and "[t]he advantages and disadvantages of the plan[,] . . . without either exaggerating the benefits or minimizing the limitations."  29 C.F.R. § 2520.102-2(b).  SPDs must be "written in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a).

As explained when addressing Pessin's § 404(a) claim, *see supra* Section II.A, the SPDs in this case adequately disclosed wear-away to plan participants and did not contain misleading information about the effect of wear-away on Pessin's benefits.  The 1999 and 2000 SPDs

31

explained that (i) the JPMC Plan transitioned from using a final average pay formula to a cash balance formula; (ii) plan participants' benefits would continue to accrue using both formulas through December 31, 2003; (iii) after December 31, 2003, a plan participant's accrued benefit under the final average pay formula would be frozen and act as a minimum benefit; and (iv) following termination of employment, plan participants would receive the larger of the minimum benefit or the balance under the Cash Balance Plan, but not both. The 2005 SPD reiterated these points and for further clarification directed plan participants to appendices that detailed the minimum benefit calculation and its comparison to the cash balance calculation. Accordingly, we conclude that the relevant SPDs did more than just describe the "greater of" formula but, in fact, described wear-away and its consequences on plan participants' accrued benefits. Therefore, the district court properly dismissed Pessin's § 102 claim because the JPMC Benefits Executive complied with its

requirements.

### C. Section 105 Claim

Pessin also challenges the district court's dismissal of his distinct claim alleging that the JPMC Benefits Executive violated ERISA § 105(a), 29 U.S.C. § 1025(a), by providing plan participants subject to wear-away with Benefit Statements that showed their cash balance benefits but not their accrued benefits under the final average pay formula. Section 105(a) requires a pension benefit administrator to provide periodic pension benefit statements that are individualized for each plan participant. Among other information, the "pension benefit statement . . . shall indicate, on the basis of the latest available information . . . the total benefits accrued." 29 U.S.C. § 1025(a)(2)(A)(i)(I). ERISA does not define the phrase "total benefits accrued." However, the statute does define the distinct phrase "accrued benefit" to mean (as relevant here) "the individual's accrued benefit determined under the plan and . . . expressed in the form of

an annual benefit commencing at normal retirement age." *Id.* § 1002(23)(A).

The Defendants contended at oral argument that the term "accrued benefit" has a technical meaning in the context of ERISA, citing *Hirt v. Equitable Retirement Plan for Employees, Managers, & Agents*, 533 F.3d 102 (2d Cir. 2008). In *Hirt*, this Court was called on to interpret the phrase "rate of benefit accrual," as used in ERISA's prohibition on age-based reductions in benefit awards. *Id*. at 104; *see* 29 U.S.C. § 1054(b)(1)(H)(i). The plaintiffs in that case cited the definition of "accrued benefits" as offering partial support for their reading of the phrase "rate of benefit accrual," but the *Hirt* Court rejected the comparison, invoking the rule that "[w]hen Congress uses particular language in one section of a statute and different language in another, we presume its word choice was intentional." *Hirt*, 533 F.3d at 108 (citation and quotation marks omitted). Thus, as relevant here, *Hirt* stands for the narrow proposition that the

definition of "accrued benefit" should not be imported wholesale in construing the distinct phrase "total benefits accrued." The absence of a definition for "total benefits accrued" does not help the Defendants, however, as we find no case that offers a definitive or contextual interpretation of "total benefits accrued" for purposes of ERISA. We therefore interpret "total benefits accrued" consistent with its ordinary meaning. *See BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 237 (2021) ("When called on to interpret a statute, this Court generally seeks to discern and apply the ordinary meaning of its terms at the time of their adoption.").

Under a plain reading of "total benefits accrued," Pessin has stated a claim. Pessin alleges that the account statements he received contained only the benefit he had accrued under the cash balance formula and that this violated § 105(a) because the amount accrued under the cash balance formula was not the benefit he was entitled to receive. Rather, according to the Amended Complaint, from 2003 to

2019 his "total benefit[] accrued" was the amount he was entitled to under the frozen final average pay formula. And yet that amount never appeared on his account statements. The Defendants suggest that the exact amount of a plan participant's final average pay benefit fluctuated even after it was frozen in 2003 due to changes in interest rates, but this is not relevant at this stage of the litigation because Pessin alleges that "his cash balance benefit never exceeded his final average pay benefit," an allegation that must be taken as true. J. App'x at 20, ¶ 47. Thus, the account statements consistently failed to provide Pessin with his "total benefits accrued," in violation of § 105(a).

This reading is not only consistent with the text of ERISA, but also makes sense in practice. "Congress' purpose in enacting the ERISA disclosure provisions [was to] ensur[e] that the individual participant knows exactly where he stands." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103 (1989). ERISA was meant "to provide

specific data to participants and beneficiaries concerning the rights and benefits they are entitled to under the plans and the circumstances which may result in their not being entitled to benefits." S. Rep. No. 93-127, at 27 (1974). Pessin's disclosure claim does not raise some complex or technical argument about the esoteric mechanisms behind his pension plan. He simply claims that the Defendants had to tell him the amount of pension benefits he had earned to date, information that lies at the very core of what a plan participant would want to know.

The Defendants offer three counterarguments in contending that the pension benefit administrator provided Benefit Statements that properly indicated Pessin's total benefits accrued under § 105(a). First, the Defendants point to the following disclaimer on the pension benefit statements that Pessin received: "This statement does not reflect any minimum benefit that you might have accrued under a prior plan formula. If you would like more information about

minimum benefits, you can call HR Answers." J. App'x at 173. The Defendants argue "[t]his was enough to 'indicate' Pessin's total benefits because it provided the amount in the participant's cash balance account while also pointing to a possibly higher minimum benefit and the opportunity to obtain more information about that minimum benefit." Appellees' Br. at 36. But the Defendants' reading of "indicate" stretches that verb well past its breaking point. Even accepting the Defendants' preferred definition of "indicate" as meaning "to point out or to," *id.* (quoting Webster's New International Dictionary of the English Language 1265 (2d ed. 1953)), the Defendants did not "point out" the "total benefits accrued" by Pessin, but rather indicated *where that information might be obtained*. Section 105(a) plainly requires a statement of the amount of benefits an individual has accrued to date. This is confirmed by the requirement that the statement be based "on the basis of the latest available information." 29 U.S.C. § 1025(a)(2)(A)(i). This phrase, and

the requirement to provide benefit statements, would be rendered meaningless if it could be satisfied by the mere suggestion that an unspecified higher minimum benefit "might" apply.

Second, the Defendants observe that "ERISA allows the administrator of a defined benefit plan to satisfy its obligations under 29 U.S.C. § 1025 without providing any pension benefit statement at all." Appellees' Br. at 37. It is true that, as an alternative to providing periodic pension benefit statements, a defined benefit plan administrator may provide the participant with a "notice of the availability of the pension benefit statement and the ways in which the participant may obtain such statement." 29 U.S.C. § 1025(a)(3)(A). This provision does not help the Defendants here, however, because the documents that the Defendants periodically provided to Pessin were plainly intended to be Pessin's Benefit Statements. Pessin alleges these were, in fact, Benefit Statements and, more importantly, that he understood them to be his Benefit Statements. By electing to

39

provide these statements, the Defendants plainly triggered the disclosure requirements of § 105(a). While penalizing the Defendants for providing more information than is strictly required may seem counterintuitive at first glance, upon reflection this rule makes perfect sense. If Pessin had simply received a piece of paper in the mail every year stating, "your pension benefit statement is available, call this toll-free number to get it," there is a good chance that he (and any other reasonably prudent pensioner) would have been curious about what his benefits were and would have called to get a copy of the statement. At this point, he would have learned that his benefits were effectively frozen and had been since 2003. Instead, Pessin received documents titled "Account Statement[]" that, by including a steadily growing cash account balance, led him to incorrectly believe his pension benefits were growing when they were not. Pessin thus had no reason to inquire further about what his benefits were beyond a suggestion that some alternative minimum "might" apply. In short, the JPMC

Benefits Executive may not have been under a duty to provide Pessin with a Benefit Statement, but once it did so, it was obligated to provide a Benefit Statement that accurately reflected his total benefits accrued. *See Est. of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir. 1997) (explaining that an ERISA fiduciary has "not only a duty not to misinform, but also 'a duty upon inquiry to convey to a lay beneficiary . . . correct and complete material information about his status and options'").

Third, the Defendants argue that calculating the alternative minimum benefit for every plan participant would be unduly burdensome, and that listing two figures on account statements would have risked confusing participants. As a threshold matter, given the clarity of Congress's direction that benefit statements include the "total benefits accrued," it is not at all clear that this Court should look past ERISA's plain text to consider these policy arguments. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 131

41

(2018) (concluding that policy arguments did not "obscure what the statutory language makes clear").

As to the burden of calculating both figures, the Benefit Statements were individualized statements, and the Defendants do not dispute that they could have calculated the final average pay benefit any time an individual requested it. Thus, it is not clear why providing that alternative minimum as of some fixed date would have imposed a materially greater expense. Ultimately, the risk of confusion that might result from including two numbers on the Benefit Statements does not outweigh the risk of confusion from what the Defendants did, which was to include only one number, which did not reflect how much Pessin would receive if he left the company. At bottom, the language of § 105(a) is clear. The Benefit Statements provided to Pessin were required to contain Pessin's "total benefits accrued" and yet they did not. Accordingly, we conclude that the district court erred in dismissing Pessin's § 105(a) claim.

**D. Section 404(a) Claim Against the JPMC Board**

Turning to Pessin's § 404(a) claim, he argues that the JPMC Board breached its fiduciary duties through its failure to monitor the performance of the JPMC Benefits Executive. ERISA allows for plan fiduciaries to allocate their fiduciary responsibilities. 29 U.S.C. § 1105(c). The appointing fiduciary, however, continues to have a fiduciary duty to monitor the activities of its appointees. *See id.* §§ 1104(a)(1), 1105(a), (c).

The parties do not dispute that Pessin's failure to monitor claim is a derivative claim and therefore requires an underlying breach. *See Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 368 (2d Cir. 2014). The district court determined that Pessin could not maintain a claim for breach of the duty to monitor, because he did not allege any underlying breach of the JPMC Benefits Executive's duties under ERISA. Because, as explained above, Pessin plausibly alleges that the JPMC Benefits Executive breached its duties under ERISA § 105(a),

the district court erred in dismissing Pessin's failure to monitor claim.

### E. Defendants' Alternative Arguments

The Defendants reiterate that, in their motion to dismiss, they argued in the alternative that Pessin's claims are barred because (i) they are untimely and (ii) he released them in exchange for severance payments. The district court did not rule on either issue. Because "[w]e are 'a court of review, not of first view,'" *Havens v. James*, 76 F.4th 103, 123 (2d Cir. 2023) (quoting *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 610 (2013)), we leave these issues for the district court to consider in the first instance.

### III. Conclusion

In sum, we hold as follows:

(1) The district court did not err in granting the Defendants' motion to dismiss Pessin's ERISA § 404(a) claim against the JPMC Benefits Executive. The Defendants' written disclosures sufficiently disclosed to plan participants how the pension plan works and the effect of wear-away on a

44

participant's accrued benefits after a traditional defined benefit plan is converted to a cash balance plan.

(2) The district court did not err in granting the Defendants' motion to dismiss Pessin's ERISA § 102(a) claim against the JPMC Benefits Executive. The JPMC Benefits Executive issued SPDs that adequately apprised plan participants of their rights under the pension plan and did not mislead participants into thinking that their frozen benefits were increasing during the wear-away period.

(3) The district court erred in granting the Defendants' motion to dismiss Pessin's ERISA § 105(a) claim against the JPMC Benefits Executive, because pension plan administrators are required to provide plan participants with annual benefit statements that inform them of their total accrued benefits, and Pessin's Benefit Statements showed only the cash balance benefit even though that was less than the benefit to

which Pessin would actually be entitled.

(4) The district court erred in dismissing Pessin's ERISA § 404(a) claim against the JPMC Board. Pessin adequately alleged an underlying breach by the JPMC Benefits Executive pursuant to § 105(a) with respect to the Benefit Statements, and accordingly, Pessin adequately alleges a failure to monitor claim against the JPMC Board in that respect.

Accordingly, we AFFIRM IN PART and REVERSE IN PART the judgment of the district court, and REMAND the case for further proceedings consistent with this opinion.